2019 UT App 2

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ERNESTO NAVARRO,
Appellant.

Opinion
No. 20151019-CA
Filed January 4, 2019

Third District Court, Salt Lake Department
The Honorable Paul B. Parker
No. 141907986

Nathalie S. Skibine, Attorney for Appellant

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES JILL M. POHLMAN and DIANA HAGEN concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 Two groups of rival gang members encountered each other and began shooting. When the shooting stopped, a man in one group was dead, killed instantly by a bullet that hit his neck and severed his spine. Defendant Ernesto Navarro was in the other group and was convicted of several charges including murder. He now challenges those convictions on two grounds.

¶2 Defendant contends that he received constitutionally ineffective assistance of counsel because (1) his trial counsel failed to object on hearsay grounds to a detective's testimony concerning another witness's trial testimony and (2) his trial counsel failed to correct a jury instruction that misstated the law regarding imperfect self-defense. Because Defendant did not

suffer prejudice from the detective's testimony or the erroneous jury instruction, we conclude that Defendant did not receive constitutionally ineffective assistance of counsel. We therefore affirm.

BACKGROUND

¶3     Victim, a gang member, was driving a stolen Chevrolet Avalanche. His nephew (Nephew) was riding in the front passenger seat while Victim's two nieces sat in the back. The group encountered a sedan containing four members of a rival gang. Traveling in the sedan were Defendant, Driver, Passenger, and another individual who did not testify at trial.

¶4     The sedan stopped to investigate a man wearing blue—the color of a rival gang. According to Driver, if the person belonged to a rival gang, "[they] would have got out and fought with him or done anything, because if he's a rival gang member, then usually [they] go and . . . do something to him." However, the sedan occupants determined that the man was not from a rival gang and continued driving. They then noticed that the Avalanche was following them and that it was driven by someone—Victim—wearing red, the color of another rival gang.

¶5     People in both vehicles, including Defendant, began using hand gestures to signal their gang affiliation, commonly referred to as "throwing up gang signs." However, Driver refused to stop the sedan because he sensed "something was going to happen" and the sedan belonged to his mother. Eventually, Driver drove down an alley to elude the pursuing Avalanche.

¶6     After losing the Avalanche, Driver parked the sedan at Defendant's apartment. They went inside "to get something to drink" and turned on a video game console. When they decided to leave the apartment, Defendant took his gun with him because he "was concerned." Defendant's group continued on foot. According to Defendant, they left to go to the store to buy

some food and did not expect to meet the Avalanche occupants again. But according to Driver, Defendant said, "Let's go get these fools," and, according to Passenger, Defendant said, "We got to do something about him if we see him again."

¶7 Meanwhile, after losing sight of the sedan, Victim drove off to pick up three of his brothers-in-law, two of whom were members of his gang and at least one of whom had a gun on his person. With these reinforcements, Victim then began driving around, looking for the sedan or Defendant's group intending to fight them.

¶8 Victim eventually spotted the empty sedan. He continued driving the Avalanche around until he found Defendant's group walking down an alley. Victim stopped the Avalanche at a right angle to the alley.

¶9 Shortly thereafter, a flurry of gunfire erupted, drawing the attention of other nearby witnesses. One of the shots killed Victim. Another wounded Nephew. Everyone in the Avalanche, except Victim, scrambled to get out of the vehicle and then fled. Defendant's group also ran away.

¶10 At least thirteen shots were fired. Police later found seven spent bullet casings from Defendant's .40 caliber firearm and five spent casings from Passenger's 9mm firearm in the alley where Defendant's group had been standing. Outside the driver's side passenger door of the Avalanche, police found one spent casing and matched it to a 9mm gun found next to the driver's seat inside the Avalanche.

¶11 Defendant's group returned to his apartment, where he took a shower to remove any gunshot residue. He then left the apartment, taking both his and Passenger's guns, and attempted to stash them where they would not be found by police. According to Defendant, Passenger instructed him "to not talk to the police," and threatened that if Defendant did talk to police, "that would mean danger [to Defendant's] life or [his] family."

¶12 Police officers eventually located and arrested Defendant. When he was arrested, Defendant gave a false name. At trial, Defendant admitted that he had lied to the arresting officers. For example, he acknowledged that although he had owned his gun for about six months, he told the arresting officers that he had only received his gun on the day he was arrested. Defendant further acknowledged that he lied to police by telling them he had never been to the apartment even though he had lived there for two months, and by telling them that he had been working at a hospital on the day of the shooting.

¶13 Defendant was charged with murder, obstruction of justice, and felony discharge of a firearm. Following a jury trial, he was convicted on all counts.

ISSUE AND STANDARD OF REVIEW

¶14 Defendant contends that he was deprived of his constitutional right to effective assistance of counsel. *See generally Strickland v. Washington*, 466 U.S. 668, 686 (1984) ("The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."). "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (quotation simplified).

ANALYSIS

¶15 Defendant contends that he was deprived of the effective assistance of counsel in two ways. First, he asserts that his trial counsel was ineffective for failing to object to certain testimony

he characterizes as hearsay. Second, he asserts his counsel was ineffective for failing to object to an erroneous jury instruction.

¶16 To demonstrate ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Because both deficient performance and resulting prejudice are requisite elements for a claim of ineffective assistance of counsel, failure to prove either element necessarily defeats the claim. *Id.* at 697; *State v. Hards*, 2015 UT App 42, ¶ 18, 345 P.3d 769.

## I. Hearsay

¶17 Defendant first contends that his trial counsel "should have objected to hearsay statements" elicited from a detective "concerning prior consistent statements by the State's key witnesses"—Nephew and one of Victim's nieces. Specifically, he argues that the State was allowed "to ask a string of questions bolstering the credibility of [Nephew] and another witness from his group on the most contested issue at trial: who shot first."

¶18 A statement is hearsay when the declarant makes the statement outside of court and the statement is offered into evidence at trial to prove the truth of the matter asserted. *See* Utah R. Evid. 801(c). However, as relevant here, when the declarant is subject to in-court cross-examination, such a statement will be considered non-hearsay when the statement "is consistent with the declarant's testimony and is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying." *Id.* R. 801(d)(1)(B).

¶19 At trial, Nephew testified that Defendant's group had fired first and that no shots had been fired by Victim's group. Nephew admitted that after picking up reinforcements, the Avalanche occupants went "looking for them guys, the guys that were in front of [Victim's group] in the green sedan." When

asked why, he testified, "I believe we were going to go fight them." And despite believing that at least one of his companions had a gun, Nephew claimed that they planned to fight "[w]ith our fists." According to Nephew, they encountered Defendant's group shortly after finding the empty sedan. Nephew stated that Defendant's group had at least two guns visible and that no one in the Avalanche had a gun out. Victim stopped the Avalanche, and without words being exchanged, "firing happened." When pressed on who shot first, Nephew answered that "[t]he first shot came from the right side . . . of the vehicle" "from the alley." Nephew further testified that no shots were fired from the Avalanche.

¶20    During Nephew's cross-examination, Defendant's counsel asserted that this account departed from the version Nephew initially told to the police. Counsel asked Nephew whether he had told "the police that originally [Victim] was taking [two occupants of the Avalanche] home, and then you guys were going to take [Victim's nieces] to dinner before the run in with [Defendant's Group] took place." Counsel also asked Nephew whether he remembered telling police that one of the Avalanche occupants "actually had a gun and that [he] heard it go off." Nephew denied that he had so informed the police.

¶21    Defendant's counsel then questioned Nephew about his statement to the police that he had recognized some of the people who had been firing at him, and Nephew admitted that this statement had been false:

> Q. You were interviewed at least three times, correct?
>
> A. Yes.
>
> Q. And it was the second day that you gave them the false information about three suspects that were totally innocent?

A. Yes.

Q. And your explanation of why you gave them three suspects was because you felt pressured by the police?

A. Yes.

Q. And instead of saying 'I don't know who they were,' you gave [inaudible] people?

A. I did tell them I didn't know who they were.

Q. And you also told them that one of the individuals goes by a street name of Radio, correct?

A. Yes, sir.

¶22 Defendant's counsel later called the detective to the stand to testify regarding Nephew's police report. The detective testified that after Nephew implicated Radio, the detective discovered Radio had been two and a half hours away from the shooting when it happened. According to the detective, when he confronted Nephew about Radio's alibi, Nephew admitted that Radio had not been involved, that Nephew had simply named a person with whom he had past dealings, and that Nephew had made up the name of one of the other people he had identified as a suspect. The State then questioned the detective:

Q. [Nephew] was consistent that [Victim] was the driver?

A. Yes.

Q. He was consistent that he was the passenger?

A. Yes.

Q. He was consistent that there was another group throwing gang signs . . . that they encountered?

A. Correct.

Q. And he was consistent that there [were] men in the alley?

A. Yes.

Q. That those men in the alley had shot at his truck he was in first?

A. That's correct.

Q. He was consistent that he was hit in the arm and close to his hip?

A. Yes.

Q. Those are the type of facts that most related to your investigation, the shooting?

A. Yes. Those facts were everything related to the shooting, yes.

. . .

Q. Did [Victim's niece] ever deviate that the men from the alley shot first at the truck?

A. No.

¶23 Defendant contends that his counsel should have objected to this line of questioning. "The purpose of rule 801(d)(1)(B) is to admit statements that rebut a charge of recent fabrication or improper influence or motive, not to bolster the believability of a statement already uttered at trial." *State v. Bujan*, 2008 UT 47,

¶ 11, 190 P.3d 1255. Thus, even where testimony is properly admitted for rehabilitative purposes, it should be limited to "testimony that directly rebuts charges of recent fabrication," and not necessarily admitted in its entirety. *Id.* ¶ 10. Our supreme court has also suggested that a limiting instruction may be necessary to inform the jury that the testimony should be considered only for rehabilitative purposes. *See id.* ¶ 9. Defendant asserts that the string of questions calling out all of Nephew's prior consistent statements went beyond the scope of admissibility under rule 801(d)(1)(B) and inappropriately bolstered Nephew's testimony rather than merely rebutting a charge of prior inconsistent statements, particularly in the absence of a limiting instruction.

¶24 But even assuming Defendant's counsel performed deficiently by failing to object to this line of questioning or failing to request a limiting instruction, we ultimately conclude that Defendant cannot demonstrate prejudice resulting from this testimony. Defendant asserts that in the absence of the detective's testimony, "the State would [have been] hard pressed to meet its burden to prove beyond a reasonable doubt that [Defendant] did not act in self-defense." But we are not convinced that the introduction of Nephew's prior consistent statements had any significant impact on the ultimate verdict.

¶25 The Utah Supreme Court has recently explained that an appellate court "must 'consider the totality of the evidence before the judge or jury' and then 'ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.'" *State v. Garcia*, 2017 UT 53, ¶ 42, 424 P.3d 171 (quoting *Strickland v. Washington*, 466 U.S. 668, 695–96 (1984)). Accordingly, an appellate court must "examine the record as a whole" to determine whether the court's confidence in the jury's verdict is undermined. *Id.* ¶ 45.

¶26 While the detective's testimony may have reinforced Nephew's testimony to some degree, other credibility issues with his testimony remained—notably his admitted lies to police in the course of the investigation and his motivation to fabricate testimony both at the time he spoke to police and at the time of trial. Further, there was much more to the question of self-defense in this case than who shot first. A defendant cannot claim self-defense when he was "attempting to commit" or "committing . . . a felony" or "was the aggressor or was engaged in a combat by agreement." Utah Code Ann. § 76-2-402(2)(a) (LexisNexis 2012).

¶27 The totality of the evidence includes the testimony of Defendant and his companions, Driver, and Passenger. Defendant testified that his group left the apartment to buy some food, not to seek out the Avalanche or Victim's group. He also explained his decision to retrieve his gun and take it with him; he testified that he took it because he "was concerned." But Driver testified that Defendant stated, "Let's go get these fools," and Passenger testified that Defendant said, "We got to do something about him if we see him again." *See supra* ¶ 6. Thus, two of Defendant's own companions testified that the group left the apartment seeking a confrontation. His companions also testified "they always do something to" members of rival gangs when they see them; that Defendant had been "[t]hrowing up gang signs;" that Defendant had his gun out even before the Avalanche arrived in the alley; and that it was possible Defendant had fired first. This testimony was consistent with other testimony presented by the State, discussed above, suggesting that Defendant's group began the firefight.

¶28 Additionally, Defendant's actions and initial statements to police were evasive and designed to frustrate an investigation into his role in Victim's death. Defendant's companions testified that upon returning to the apartment, he attempted to hide the gun, remove gun residue from his person, and he expressed excitement that he could now get his gang tattoo as a result of

the shooting. Upon his arrest several days after the shooting, Defendant did not claim to have acted in self-defense. Instead, he first gave police a false name, denied driving the sedan, and denied having been anywhere in the area for years. Defendant also claimed to have been staying at a hotel but could not remember the hotel's name. Later, Defendant admitted he had been to the apartment, but only to feed some dogs; however, he could not name the owner of the dogs. Defendant also claimed that he had been working at a hospital on the day of the shooting. And still later, Defendant admitted that he had been staying at the apartment but denied having been present at the shooting. Finally, Defendant admitted that he had witnessed the shooting but denied firing his gun. It was not until trial that Defendant admitted he had fired his gun at the Avalanche, but only in self-defense. Defendant's evolving and uncorroborated account likely made it difficult for the jury to credit his trial testimony.

¶29    All this evidence amply supports a conclusion that Defendant actively sought a fight with Victim rather than acting in self-defense. Thus, we are not convinced that "there is a reasonable probability that . . . the result of the proceeding would have been different" without the detective's testimony. *See Strickland*, 466 U.S. at 694. Defendant therefore cannot show that he was deprived of the effective assistance of counsel with regard to the detective's testimony.

## II. Jury Instruction

¶30    Defendant also contends that his trial counsel was constitutionally ineffective for failing to object to an erroneous jury instruction. Specifically, he argues that his counsel "approv[ed] a jury instruction stating that [Defendant] could be convicted of manslaughter only if the jury found beyond a reasonable doubt that imperfect self-defense applied" instead of stating that "[Defendant] could be convicted of manslaughter

only if the State failed to disprove imperfect self-defense beyond a reasonable doubt."

¶31    Utah law provides that a murder charge may be reduced to a manslaughter charge when the defendant erroneously believed that the killing was legally justified, such as in self-defense:

> It is an affirmative defense to a charge of murder . . . that the defendant caused the death of another . . . under a reasonable belief that the circumstances provided a legal justification or excuse for the conduct although the conduct was not legally justifiable or excusable under the existing circumstances.

Utah Code Ann. § 76-5-203(4)(a) (LexisNexis 2012). "Once a defendant has produced some evidence of imperfect self-defense, the prosecution is required to disprove imperfect self-defense beyond a reasonable doubt." *State v. Lee*, 2014 UT App 4, ¶ 27, 318 P.3d 1164 (quotation simplified). "Because the burden of proof for an affirmative defense is counterintuitive, instructions on affirmative defenses must clearly communicate to the jury what the burden of proof is *and* who carries the burden." *Id.* (quotation simplified).

¶32    Here, the jury received three instructions regarding the burden of proof. Instruction 55 explained that "[t]he defendant is not required to prove that the defense [of imperfect self-defense] applies. Rather, the State must prove beyond a reasonable doubt that the defense does not apply." And Instruction 71 explained, "The laws of Utah do not require the defendant to prove self-defense. Once self-defense or imperfect self-defense is raised by the defendant, it is the prosecution's burden to prove beyond a reasonable doubt that the defendant did not act in self-defense." These instructions correctly stated the relevant law.

¶33    However, Instruction 53, to which Defendant's counsel acquiesced, erroneously placed the burden on Defendant to prove that imperfect self-defense applied beyond a reasonable doubt:

> You cannot convict the Defendant, Ernesto Navarro, of the offense of Manslaughter unless you find from all the evidence, and *beyond a reasonable doubt*, each and every one of the following elements: 1. That the defendant, Ernesto Navarro, . . . 2. *committed the offense of Murder under circumstances amounting to imperfect self-defense . . . .*

(Emphases added). The State concedes that Instruction 53 was erroneous but argues that Defendant was not prejudiced by the error because he was not entitled to claim imperfect self-defense.

¶34    In the State's view, Defendant was not entitled to claim imperfect self-defense because he could not have acted "'under a reasonable, but legally mistaken, belief that his use of deadly force was justified.'" (Quoting *Lee*, 2014 UT App 4, ¶ 29.) As discussed above, a defendant cannot claim self-defense when the defendant is engaged in committing a felony, is the aggressor, or is engaged in combat by agreement. *See* Utah Code Ann. § 76-2-402(2)(a).

¶35    Defendant was the only witness to testify that his group had not sought to confront Victim's group after leaving the apartment, and his uncorroborated account contradicted the testimony of other witnesses credited by the jury. The jury apparently found that Defendant's group had left the apartment in the hopes of confronting Victim's group. Given the overwhelming evidence that Defendant was the aggressor, there is no reasonable probability that the jury would have convicted Defendant of the lesser offense of manslaughter if Instruction 53 had properly explained the burden of proof. Because the evidence failed to establish a claim of imperfect self-defense,

Defendant did not suffer prejudice when one of the three instructions misstated the burden of proof.[1]

¶36  Because Defendant has not shown how the erroneous instruction prejudiced his case, he has failed to demonstrate that his counsel's assistance fell below the constitutionally required level. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984) (holding that a defendant must prove both counsel's deficient performance and resulting prejudice to succeed on a claim of ineffective assistance of counsel); *see also State v. Hards*, 2015 UT App 42, ¶ 18, 345 P.3d 769 ("Because both deficient performance and resulting prejudice are requisite elements of an ineffective assistance of counsel claim, a failure to prove either element defeats the claim.").

### III. Cumulative Error

¶37  In Defendant's reply brief, he asserts that "the two errors worked together—both the inadmissible hearsay and the faulty

---

1. Our conclusion on this point is reinforced by the fact that the jury did not ask the court to reconcile or explain the conflicting instructions regarding the burden of proof for a claim of imperfect self-defense, suggesting that the jury did not believe that imperfect self-defense applied, regardless of who bore the burden of proof. It is also worth noting that both the State and the defense attempted to steer the jury away from manslaughter. The State implored the jury, "We are not [asking you to consider manslaughter]. We are asking you to convict the defendant of murder because that's what he did." The defense likewise eschewed a manslaughter request, stating, "We're not asking you to find him guilty of manslaughter. We're asking you to find . . . . [t]hat he was justified in defending himself. . . . Please find him not guilty." Thus, the jury may have paid very little attention to the manslaughter instruction that contained the erroneous language.

instruction prevented the jury from considering imperfect self-defense." However, "issues raised by an appellant in the reply brief that were not presented in the opening brief are considered waived and will not be considered by the appellate court." *Allen v. Friel*, 2008 UT 56, ¶ 8, 194 P.3d 903 (quotation simplified). Thus, Defendant has waived his cumulative-error claim.

## CONCLUSION

¶38 Defendant's trial counsel's failure to object on hearsay grounds to testimony regarding Nephew's initial statement to a detective and counsel's failure to object to the erroneous jury instruction did not lead to any discernable prejudice. We therefore conclude that Defendant has not demonstrated that his counsel's assistance was constitutionally ineffective.

¶39 Affirmed.

_____