**2023 UT App 148**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
LEON WILLIAM BARNES,
Appellant.

Opinion
No. 20210403-CA
Filed December 14, 2023

Third District Court, Salt Lake Department
The Honorable Adam T. Mow
No. 181910110

Andrea J. Garland, Attorney for Appellant

Sean D. Reyes and Jonathan S. Bauer,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and DAVID N. MORTENSEN concurred.

HARRIS, Judge:

¶1 Leon William Barnes was convicted of object rape and forcible sexual abuse of his fourteen-year-old stepdaughter (Stepdaughter). Barnes now appeals, arguing that Stepdaughter's testimony was inherently improbable and that there was insufficient evidence supporting the penetration element of the object rape charge. He also argues that his trial counsel provided ineffective assistance of counsel. We reject Barnes's arguments and affirm his convictions.

BACKGROUND

¶2    In 2018, Barnes resided with his wife (Wife), daughter (Daughter), niece (Niece), and Stepdaughter (Wife's child from a previous relationship) in Salt Lake County, Utah. That year, Stepdaughter reported to Wife that Barnes had been sexually abusing her. Upon receiving this report, Wife took Stepdaughter to a hospital, but medical personnel were unable to perform a useful examination because the alleged abuse had occurred weeks or months earlier. Wife also contacted the police.

¶3    Law enforcement personnel arranged for Stepdaughter to be interviewed at the Children's Justice Center (CJC) by an investigating officer (Officer). At this interview, Stepdaughter offered her version of events. She alleged that Barnes frequented her bedroom in the early hours of the morning to touch her "private part." When asked whether she used this "private part" to "pee or poop," Stepdaughter responded "[b]oth." Stepdaughter said that this abuse occurred on something close to a daily basis, and that on one of these occasions, Barnes put his mouth on Stepdaughter's breast. And Stepdaughter reported that during another incident, Barnes claimed that he would "kill her or actually rape her" if she reported the touching to anyone. At no point during the CJC interview, however, did Stepdaughter tell Officer that Barnes had ever penetrated her vagina with his finger.

¶4    A few weeks later, the State charged Barnes with one count each of forcible sodomy, object rape, forcible sexual abuse, and tampering with a witness. A preliminary hearing was held at which Stepdaughter testified. During her testimony, Stepdaughter described three specific instances in which Barnes had come into her bedroom and touched her inappropriately; she stated that, on one occasion, Barnes had penetrated her "private part" with his finger. At the conclusion of the hearing, the State withdrew the forcible sodomy charge, and the court declined to bind Barnes over for trial on the witness tampering charge. The

court did, however, bind Barnes over for trial on the object rape and forcible sexual abuse charges, and the State amended the information to reflect the more limited charges.

¶5    The case then proceeded to a jury trial, which took place in November 2019. During his opening statement, Barnes's counsel outlined the defense's theory of the case. Essentially, he argued that the events Stepdaughter described had never taken place, and that Stepdaughter was not telling the truth about the abuse. He posited that Stepdaughter was motivated to invent allegations about Barnes for several reasons, including pressure from other family members who did not like Barnes, and including Stepdaughter's dissatisfaction with Barnes's apparently strict parenting style. And counsel suggested that Stepdaughter's account of events had changed over time and was inconsistent.

¶6    The State called Stepdaughter as its first witness. During her testimony, she described the same three specific events she had discussed during her preliminary hearing testimony. In particular, she testified that, a few weeks before she turned fourteen, Barnes asked her if she wanted to "learn about boys," to which she replied that she did not. A few weeks later, after Stepdaughter had turned fourteen, Barnes came into her bedroom at "like 3 in the morning," "put his hands in [her] pants," and touched her "private part" (Incident 1). She stated that she did not have "another name" for this part of her body, but she stated that it was "below [her] stomach" and that she used it "[t]o go to the bathroom." When asked to mark the relevant area of the body on a diagram, Stepdaughter circled the entire front genital area, but she made no mark on the back side of the body on the diagram. She testified that, during this first incident, Barnes moved his hand up and down on her private part for a few minutes, which caused pain and a burning and pinching sensation. On cross-examination, Stepdaughter acknowledged that, during this first incident, Barnes "did not put his finger inside" her private part. This incident ended when Barnes left to go to work.

¶7 The prosecutor asked Stepdaughter if she remembered "another time" when Barnes "came into [her] room and touched" her, and Stepdaughter answered affirmatively. She testified that, in this second incident (Incident 2), Barnes again entered her room around 3:00 a.m., unclipped her bra, and "put his mouth on" her breast. Stepdaughter marked the location of this touching—her right breast—on the same diagram.

¶8 The prosecutor asked whether there was "another time that [Barnes] did something slightly different than what [Stepdaughter had] described before," and Stepdaughter answered in the affirmative. She testified that, in this third incident (Incident 3), she was in her bedroom, sleeping on the floor, and Daughter was in the room asleep on the bed. Barnes entered the room around 5:00 or 6:00 a.m. before leaving for the airport to catch a flight. He put his hand inside Stepdaughter's underwear and "put his finger inside of" Stepdaughter's "private part." When asked to identify, on the diagram, the place "where he put his finger inside" of her, Stepdaughter placed an "X" in the center of the circle she had previously drawn in connection with Incident 1, right at the location of the vagina. The prosecutor asked her how she knew that Barnes's finger was "inside of" her, and Stepdaughter testified that "it felt different" than the previous occasion and that she "could feel it" inside of her. She added that Barnes "kind of like pushed it up" and that "[i]t hurt." On cross-examination, she continued to maintain that Barnes had put his finger inside of her, although she acknowledged that she had not mentioned this during the CJC interview.

¶9 These three incidents were the only ones for which Stepdaughter offered a specific description, although she testified that Barnes touched her on nearly a daily basis. When Stepdaughter told Barnes that she wanted the activity to stop, Barnes said that, if she told anyone, "he would hurt everybody in [her] family or he would actually rape [her]." She claimed that she

did not initially tell people about the abuse because she was scared and she didn't think people would believe her.

¶10    Stepdaughter also testified that she first disclosed the abuse to her mother after an episode in which Barnes became angry at Stepdaughter when he came to believe that she had caused a power outage in the basement of the home by intentionally damaging the fuse box. In her testimony, Stepdaughter made several statements that were inconsistent with later testimony provided by Wife and Barnes. She said that she did not put a screw in one of the breakers or tell Wife that she had done so, and that Barnes did not threaten to punish her after this incident. She said that the lights had gone out because she "flipped a switch" and it "kind of made everything shut down." Stepdaughter also claimed that she does not sleep well and that she was awake when each of the three specific abuse incidents occurred. And she testified that her natural father had never told her to report that Barnes was sexually abusing her.

¶11    Next, the State called Wife as a witness, and she testified that, on the day of the basement blackout, she arrived home and saw that there was some sort of confrontation going on between Stepdaughter and Barnes. Wife saw "urgency in [Stepdaughter's] face" and observed that Barnes was "standing in [a] door" and not "letting [Wife] in the room." Later, after Stepdaughter told her about the abuse, Wife immediately called the police and took Stepdaughter to a hospital. At the hospital, healthcare providers did not complete a sexual abuse examination; they told Wife that such an exam would not be helpful because the abuse had happened some time ago. Wife also testified that Barnes would regularly go to work around 4:00 a.m.

¶12    On cross-examination, Wife said that Stepdaughter admitted to putting a screw in the fuse box and that Barnes had threatened to spank Stepdaughter as a result. Wife also confirmed that Stepdaughter does have trouble sleeping, but that she

sometimes sleeps until noon when she is able to. In addition, Wife testified that, some time ago, Stepdaughter's natural father tried to get Stepdaughter to allege that Barnes was sexually abusing her, even though this was untrue at the time.

¶13   Finally, the state called Officer, who testified about interviewing Stepdaughter at the CJC. Officer testified that she frequently asks non-leading and non-direct questions, especially at the beginning, "to allow the child to give as much narrative as possible." Officer also testified that it happens "quite frequently" that a child will disclose something for the first time only after the initial interview is over. On cross-examination, Officer acknowledged that, during the interview, Stepdaughter had not mentioned anything about Barnes putting his finger inside of her even though Officer asked Stepdaughter to "[t]ell [her] everything that happened."

¶14   After the conclusion of the State's case-in-chief, Barnes testified in his own defense. He explained that he was a rather strict parent and that there was tension among Wife's family members because of his role in parenting Stepdaughter. He testified that Niece—who had moved into the house "shortly before" the basement blackout—had been a bad influence on Stepdaughter and that Stepdaughter's respect for Barnes had deteriorated since Niece moved in. With regard to the blackout episode, Barnes testified that he told Stepdaughter and Niece—who he believed were potentially responsible—that, if he ever found out that they had been responsible, he was "going to beat [their] ass real good." Barnes offered his view that Stepdaughter had reported sexual abuse in an effort to avoid punishment for causing the basement blackout. Barnes denied ever sexually abusing or inappropriately touching Stepdaughter.

¶15   After deliberation, the jury found Barnes guilty on both charges. Barnes then filed a motion for a new trial and to arrest judgment, arguing that Stepdaughter's testimony was inherently

improbable and there was insufficient evidence of penetration to support the object rape conviction. The trial court disagreed and denied the motion. Later, the court sentenced Barnes to prison on both charges, with the sentences to run consecutively.

## ISSUES AND STANDARDS OF REVIEW

¶16 Barnes now appeals, and he raises three issues for our consideration. First, he claims that the State did not present sufficient evidence to support his convictions. This argument has two parts. Initially, he asserts that Stepdaughter's trial testimony was inherently improbable and therefore cannot be used to support his conviction on either charge. In addition, he argues that—either with or without Stepdaughter's testimony—there exists insufficient evidence to support the object rape conviction. For "a sufficiency of the evidence challenge, we will only reverse the fact finder's verdict when the evidence is sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime for which he or she was convicted." *State v. Jok*, 2021 UT 35, ¶ 17, 493 P.3d 665 (quotation simplified).

¶17 Second, Barnes asserts that his trial counsel provided constitutionally ineffective assistance by not requesting a lesser-included-offense jury instruction on the object rape charge. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Guerro*, 2021 UT App 136, ¶ 25, 502 P.3d 338 (quotation simplified), *cert. denied*, 525 P.3d 1254 (Utah 2022).

¶18 Finally, Barnes has filed a motion, pursuant to rule 23B of the Utah Rules of Appellate Procedure, asking this court to remand the case to the trial court for supplementation of the record regarding additional claims of ineffective assistance of

counsel. "A remand under rule 23B is available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *State v. Tuinman*, 2023 UT App 83, ¶ 53, 535 P.3d 362 (quotation simplified).

## ANALYSIS

### I. Sufficiency of the Evidence

¶19   Barnes first asserts that the State presented insufficient evidence to support convictions on either charge. Key to Barnes's claims in this regard is his assertion that Stepdaughter's testimony is inherently improbable and should be disregarded in any sufficiency-of-the-evidence analysis. In situations like this one, our analysis has two parts. *See State v. Jok*, 2021 UT 35, ¶ 30, 493 P.3d 665. First, we must analyze the evidence that Barnes claims is inherently improbable and "determine[] whether the challenged piece of evidence is of such a poor quality that it should be disregarded." *Id.* If we determine that the challenged testimony is inherently improbable, we "then determine if sufficient evidence remains under which a reasonable jury could have convicted." *Id.*; *see also State v. Skinner*, 2020 UT App 3, ¶ 26, 457 P.3d 421 ("[A] defendant who raises [an inherent-improbability] claim . . . is asking the court, in conducting its sufficiency-of-the-evidence review, to examine only a particular subset of the admitted evidence, and to disregard certain witness testimony before undertaking that review."), *cert. denied*, 462 P.3d 805 (Utah 2020). At oral argument before this court, the State conceded that, without Stepdaughter's testimony, there is not sufficient evidence to convict Barnes on either charge.

¶20   On the other hand, if we determine that the challenged evidence is not inherently improbable, our sufficiency-of-the-evidence analysis will include the challenged evidence. *See Skinner*, 2020 UT App 3, ¶ 25. In that situation, we will consider

"all admitted evidence to determine if some evidence exists that could support the verdict," since "it is ordinarily not the court's place to disregard any particular items of admitted evidence." *Id.* (quotation simplified). Barnes, for his part, acknowledges that, if Stepdaughter's testimony is included in the calculus, there exists sufficient evidence to support his conviction on the forcible sexual abuse count. Thus, if we reject Barnes's inherent-improbability argument, then his sufficiency-of-the-evidence challenge is limited to the object rape count.

¶21 Given the relationship between Barnes's arguments, we examine his inherent improbability claim first, then address his sufficiency claim only after we know the dimensions of the universe of evidence we are allowed to consider.

A

¶22 The first issue we must confront is whether Stepdaughter's testimony is so inherently improbable that it "should be disregarded as evidence." *Jok*, 2021 UT 35, ¶ 30. Barnes asserts that Stepdaughter's testimony satisfies this threshold because, he argues, her testimony is laden with inconsistencies, lacks corroboration, and has a "context and history" that includes "domestic drama" that suggests "possible coaching." After examination of Stepdaughter's testimony, we take Barnes's point that it contained certain inconsistencies and other characteristics that may make good fodder for cross-examination. But we ultimately reject Barnes's arguments, because we cannot say that Stepdaughter's testimony is so inherently improbable as to warrant exclusion from the sufficiency analysis.

¶23 In *State v. Robbins*, 2009 UT 23, 210 P.3d 288, our supreme court held that "when [a] witness's testimony is inherently improbable, the court may choose to disregard it." *Id.* ¶ 16. But testimony is considered "inherently improbable" only if it "run[s] so counter to human experience that it renders the testimony inappropriate for consideration in sustaining a finding of guilt."

*See Jok*, 2021 UT 35, ¶ 36 (quotation simplified). Indeed, Utah appellate courts have noted that labeling a witness's testimony as "inherently improbable" should be reserved for "rare cases." *See id.* ¶ 31; *see also State v. Rivera*, 2019 UT App 188, ¶ 23 n.6, 455 P.3d 112 ("A case which actually falls within the *Robbins* . . . rubric is exceedingly rare."), *cert. denied*, 458 P.3d 749 (Utah 2020). This is because "appellate courts typically do not make credibility determinations," and typically resolve any arguments about "conflicts in the evidence in favor of the jury verdict." *Jok*, 2021 UT 35, ¶ 28 (quotation simplified); *see also State v. Prater*, 2017 UT 13, ¶ 32, 392 P.3d 398 (stating that appellate courts "are not normally in the business of reassessing or reweighing evidence").

¶24    The test that we apply in considering whether testimony is "inherently improbable" is "whether the testimony could support a conviction or whether reasonable minds must have entertained a reasonable doubt that the defendant committed the crime for which he or she was convicted." *Jok*, 2021 UT 35, ¶ 19 (quotation simplified). In undertaking this inquiry, courts are to consider the situation as a whole, including the context in which the testimony was offered, and are not to consider themselves limited to any list of factors. *Id.* ¶ 32 (stating that there is no "strictly factored test"). There are three hallmarks of inherently improbable testimony that courts have often considered in their analysis: "material inconsistencies, patent falsehoods, and lack of corroborating evidence." *Id.*; *see also Prater*, 2017 UT 13, ¶ 38 ("It was the inconsistencies in the child's testimony *plus* the patently false statements the child made *plus* the lack of any corroboration that allowed this court to conclude that insufficient evidence supported Robbins's conviction."). But our supreme court has warned "against inflexible reliance on these [three] factors." *See Jok*, 2021 UT 35, ¶ 32. Courts are still allowed—and perhaps even encouraged—to examine these three factors, but courts must avoid robotic reliance on them, and must keep in mind that "the proper test is, and always has been, whether reasonable minds

must have entertained a reasonable doubt that the defendant committed the crime." *Id.* (quotation simplified).

¶25 With this standard in mind, we address Barnes's specific arguments regarding Stepdaughter's testimony. In that regard, he does not assert that Stepdaughter's trial testimony contained any patent falsehoods.[1] But he does assert that her testimony contained material inconsistencies, was not corroborated by other evidence, and was given in a "context" that suggested "possible coaching." We examine these arguments, in turn.

¶26 In his briefing, Barnes identifies about a dozen instances where he believes Stepdaughter's testimony was inconsistent with either her previous testimony or with the testimony of Wife, Barnes, or Officer. These instances include Stepdaughter testifying that Barnes touched her where she urinates and defecates though only marking the diagram on the front genital area; not reporting penetration to Officer during the CJC interview despite Officer asking Stepdaughter to tell her everything; indicating that her natural father did not tell her to report sexual abuse by Barnes, which was contrary to Wife's testimony; denying that she put a screw in the breaker box on the day of the basement blackout and that Barnes had subsequently threatened to "beat [her] ass," all of which was contrary to Barnes's and Wife's testimony; and testifying that she was awake during all three specifically described incidents of abuse, despite

---

1. With regard to patent falsehoods, the only example to which Barnes points is a statement Stepdaughter made during her preliminary hearing testimony in which she testified that, after one episode of abuse, Barnes left a "$25 bill" on her dresser. But the jury did not hear this statement, because Stepdaughter did not repeat it at trial. And in any event, she clarified during later preliminary hearing testimony that Barnes actually left "[a] $20 and a $5" on her dresser.

Wife's testimony that Stepdaughter will sometimes sleep until noon when she can.

¶27 We acknowledge that Stepdaughter's testimony included certain statements that were inconsistent with things she had said before or with the testimony of other trial witnesses. But this is true with regard to many complaining witnesses; indeed, it would be a rare case in which defense counsel could identify no inconsistencies in the account given by the State's main witness. In order to constitute the sort of discrepancies that would raise inherent-improbability concerns, the inconsistencies in question need to be "[s]ubstantial." *See Robbins*, 2009 UT 23, ¶ 17 (stating that "[*s*]*ubstantial* inconsistencies in a sole witness's testimony . . . can create a situation where the prosecution cannot be said to have proven the defendant's guilt beyond a reasonable doubt" (emphasis added)); *see also Prater*, 2017 UT 13, ¶ 39 ("The question of which version of [the witnesses'] stories was more credible is the type of question we routinely require juries to answer."); *In re J.R.H.*, 2020 UT App 155, ¶ 11, 478 P.3d 56 (stating that we do not "apply *Robbins* to garden-variety credibility questions, such as which witness to believe, or which version of a witness's conflicting account to believe").

¶28 In our view, the inconsistencies Barnes identifies in Stepdaughter's testimony do not rise to a level at which reasonable minds could not have believed Stepdaughter's account. Like our supreme court did in *Prater* and *Jok*, we conclude that the inconsistencies in Stepdaughter's testimony were not so pervasive and material as to render her testimony inherently improbable. *See Jok*, 2021 UT 35, ¶ 40 (stating that the witness's statements "do not approach the level of inconsistency that may cause us to disregard a testimony"); *Prater*, 2017 UT 13, ¶ 39 (stating that "the inconsistencies in [the witnesses'] accounts by themselves are insufficient to invoke the inherent improbability exception" (quotation simplified)).

¶29     Next, Barnes asserts that there is little, if any, evidence corroborating Stepdaughter's account that Barnes sexually abused her. Where significant corroborating evidence exists, that alone can defeat a claim that the complaining witness's testimony is inherently improbable. *See Skinner*, 2020 UT App 3, ¶¶ 31, 34; *Rivera*, 2019 UT App 188, ¶¶ 24–25. Indeed, "[c]orroborating evidence sufficient to defeat a *Robbins* claim does not have to corroborate the witness's account across the board." *Skinner*, 2020 UT App 3, ¶ 34. "It just has to provide a second source of evidence for at least some of the details of the witness's story." *Id.*

¶30     In this case, the State asserts that Barnes's own testimony—that he would often pass by Stepdaughter's bedroom door in the wee hours of the morning on the way to his early-morning job—provides sufficient corroboration for Stepdaughter's account. But this corroborates only a very minor point of Stepdaughter's testimony, and provides an independent source of evidence only for the fact that Barnes had the opportunity to commit the crimes with which he was charged; it does not provide an independent source of evidence showing that Barnes actually did commit the crimes with which he was charged. As Barnes points out, similar corroborative evidence was available in *Robbins* itself—it was uncontested that the defendant shared a house with the complaining witness (his stepdaughter) and therefore had the opportunity to commit abuse—yet the *Robbins* court stated that, aside from the complaining witness's testimony, "no other evidence points to Robbins' guilt." *See* 2009 UT 23, ¶¶ 3, 23. We therefore agree with Barnes that the mere fact that he shared a house with Stepdaughter and sometimes passed her bedroom door at around 3:00 a.m. is not the sort of corroborative evidence sufficient to, by itself, defeat a *Robbins* claim.

¶31     But by the same token, the relative lack of corroborating evidence also does not automatically substantiate a *Robbins* claim. Indeed, "a jury can convict on the basis of the uncorroborated testimony of" the complaining witness. *Id.* ¶ 14 (quotation

simplified). The relative lack of corroboration is therefore just one factor to consider in our ultimate assessment as to whether "reasonable minds must have entertained a reasonable doubt that the defendant committed the crime." *See Jok*, 2021 UT 35, ¶ 32 (quotation simplified).

¶32 Finally, Barnes asks us to consider "the context and history" underlying Stepdaughter's account of events, which Barnes asserts "indicate[] a reasonable probability that [the allegations] were prompted by domestic drama [and] possible coaching." Even though "context" is not specifically listed among the "factors" that courts evaluating *Robbins* claims ought to consider, we see no reason why courts should not consider contextual matters in evaluating whether a witness's testimony is inherently improbable. After all, the inquiry is a holistic one that excludes testimony only when it is "so counter to human experience that it renders the testimony inappropriate for consideration in sustaining a finding of guilt." *See id.* ¶ 36 (quotation simplified). In undertaking this inquiry, consideration of the context in which the allegations were made could certainly be relevant.

¶33 Barnes's specific arguments related to "context and history" are that Stepdaughter made her allegations in general protest to Barnes's apparently strict style of parenting, and in specific protest to being blamed for causing the basement blackout. Barnes also notes Wife's testimony—denied by Stepdaughter—that Stepdaughter had been under some pressure from her natural father to accuse Barnes of sexual abuse. But like the inconsistencies Barnes identifies (discussed above), these contextual arguments—while perhaps providing material for cross-examination—do not render Stepdaughter's testimony inherently improbable. These kinds of issues are—to one degree or another—often present in all types of family-based cases, including not only criminal cases but also divorce, paternity, and child welfare cases. We recognize that, in some instances,

especially where other problems with the testimony are established, *see, e.g., Robbins*, 2009 UT 23, ¶¶ 4, 22–24, contextual clues like these might contribute to a determination that a witness's testimony is inherently improbable. But in this case, these issues presented a basis for cross-examination and argument and may have provided a ground upon which a factfinder could decide not to believe the complaining witness, but they are not enough to cause us to consider Stepdaughter's version of events inherently improbable.

¶34   In sum, Barnes has not carried his burden of demonstrating that Stepdaughter's testimony was inherently improbable. To be sure, there were inconsistencies in her testimony, and no evidence was presented directly corroborating her allegations that Barnes had sexually abused her in her bedroom. But even considered in context, the questions Barnes raises about Stepdaughter's testimony are the kinds of questions that "we routinely require juries to answer," after fulsome cross-examination and argument. *See Prater*, 2017 UT 13, ¶ 39. As we see it, Stepdaughter's version of events was not "so counter to human experience" that it could not have been credited by a reasonable jury. *See Jok*, 2021 UT 35, ¶ 36 (quotation simplified). We cannot say that, after reviewing Stepdaughter's testimony, "reasonable minds must have entertained a reasonable doubt that [Barnes] committed the crime." *See id.* ¶ 32 (quotation simplified).

¶35   Accordingly, we reject Barnes's assertion that Stepdaughter's testimony was inherently improbable.

B

¶36   Now that we have determined that Stepdaughter's testimony was not inherently improbable, we may consider Stepdaughter's testimony in evaluating Barnes's claim that the State failed to present sufficient evidence to support his convictions. As already noted, Barnes concedes that, if Stepdaughter's testimony is included in the analysis, there exists

sufficient evidence to support his conviction for forcible sexual abuse. He maintains, however, that even considering Stepdaughter's testimony, there was not sufficient evidence to support his conviction for object rape. We disagree.

¶37 Under Utah law, "[a]n actor commits object rape if" the actor "causes the penetration, however slight, of the genital or anal opening of [an] individual by . . . a part of the human body other than the mouth or genitals." Utah Code § 76-5-402.2(2). Barnes's challenge is specific to one statutory element of this crime: penetration. "'Penetration' in this context means entry between the outer folds of the labia." *State v. Patterson*, 2017 UT App 194, ¶ 3, 407 P.3d 1002 (quotation simplified), *cert. denied*, 417 P.3d 580 (Utah 2018). In particular, Barnes asserts that Stepdaughter's testimony on this point "was too imprecise for the jury and trial court to infer that she described penetration of the outer labial folds."

¶38 As set forth above, Stepdaughter described three specific incidents of abuse, two of which involved allegations that Barnes touched her genitals. With regard to Incident 1, Barnes asserts—in an argument not without force—that any inference that penetration was achieved would be unduly speculative. After all, Stepdaughter expressly denied that any penetration occurred during that incident. We therefore assume, for purposes of our analysis, that no penetration occurred during Incident 1.

¶39 But Incident 3 presents a different story. Specific to that incident, Stepdaughter testified that Barnes put his finger "inside" of her "private part." On the diagram, she marked the location of the body part into which Barnes inserted his finger, and she did so by placing an "X" in the center of the figure's front genital area, in the location of the vagina. When she was asked how she knew that Barnes's finger was inside of her, Stepdaughter replied that "it felt different" than the previous occasion on which Barnes merely touched the outside of her genitals; she testified that, this

time, she "could feel it" inside of her, that Barnes "kind of like pushed it up," and that "[i]t hurt."

¶40 Despite the apparent clarity of this testimony, Barnes asserts that Stepdaughter's testimony can lead only to "speculation" that Barnes penetrated her genital opening with his finger. Barnes argues that "there were insufficient facts for a reasonable inference that Stepdaughter intended 'inside' to mean inside the labial folds." Barnes contends that Stepdaughter—a sixteen-year-old witness—needed to have used more precise language to "explain where she meant the finger went inside," especially given her testimony that her "private part" is one she uses to "both" "pee" and "poop."

¶41 We simply disagree. In our view, Stepdaughter's testimony regarding Incident 3 was sufficiently clear to support a determination that Barnes inserted his finger far enough into her genital opening to constitute penetration. She testified clearly that Barnes put his finger "inside" her private part, one she identified on the diagram as located where the vagina is located. She contrasted this incident with Incident 1, in which Barnes had *not* penetrated her vagina, and indicated that this incident felt different because she "could feel" Barnes's finger inside of her. This evidence was more than sufficient to support a determination that Barnes had penetrated her with his finger.

¶42 Accordingly, the State presented sufficient evidence to support Barnes's conviction for object rape, and we reject Barnes's arguments to the contrary. Thus, sufficient evidence supported both of Barnes's convictions.

## II. Ineffective Assistance of Counsel

¶43 Next, Barnes claims that his attorney rendered constitutionally ineffective assistance by forgoing any request for a lesser-included-offense jury instruction on the object rape charge. In particular, Barnes asserts that his attorney should have

asked that the jury be allowed to consider forcible sexual abuse as a possible lesser-included offense on that count, one that the jury could avail itself of if it believed that Barnes had touched Stepdaughter's genitals during Incident 3 but had not actually achieved penetration. While we agree with Barnes that his attorney could reasonably have elected to seek such an instruction, we reject Barnes's assertion that his attorney performed deficiently by electing *not* to.

¶44    To prevail on an ineffective assistance of counsel claim, Barnes "must demonstrate that (1) his counsel's performance was deficient in that it fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense." *State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871 (quotation simplified). In assessing the first element—deficient performance—courts often consider whether counsel's "action might be considered sound trial strategy." *See State v. Scott*, 2020 UT 13, ¶ 35, 462 P.3d 350 (quotation simplified). Attorneys who have a sound strategic basis for their actions have "not perform[ed] deficiently." *Id.*

¶45    We have previously noted that attorneys often have a sound strategic basis for deciding not to ask for a lesser-included-offense instruction. *See State v. Powell*, 2020 UT App 63, ¶ 42, 463 P.3d 705 ("Even when there is a basis for a lesser-included-offense instruction, counsel can reasonably decide not to request one." (quotation simplified)). "When an appellant challenges trial counsel's failure to request a lesser-included-offense instruction as constitutionally ineffective, the appellant runs headlong into the strong presumption that, under the circumstances, the failure to request the lesser-included-offense instruction might be considered sound trial strategy." *Id.* (quotation simplified). "Depending on the facts of a particular case, counsel may have perfectly valid tactical reasons to forgo the instruction and to instead present an 'all or nothing' defense that entails avoiding a lesser-included-offense instruction in the hopes the jury will find

the defendant totally innocent of any wrongdoing." *Id.* (quotation simplified). For example, counsel does not perform deficiently when "it would be reasonable for counsel to conclude that submitting a lesser-included-offense instruction would obviate a defendant's reasonable chances of a full acquittal." *Id.* ¶ 43 (quotation simplified).

¶46    A reasonable attorney could have decided, in keeping with a sound trial strategy on the facts of this case, to forgo asking for a lesser-included-offense instruction on the object rape count. Here, Stepdaughter did not tell Officer about penetration during the CJC interview, a fact counsel brought to the attention of the jury several times during trial. If the jury believed Stepdaughter's account that Barnes had touched her genitals during Incident 3 but had not achieved penetration, the jury would have convicted Barnes of forcible sexual abuse if that had been an option on the verdict form. But if that option was not available, and the only option on that charge was object rape, a jury who believed that no penetration had occurred would have had to acquit Barnes entirely. On the record before us, this strategy appears eminently reasonable. While a different attorney might have selected a different strategy, we cannot say that Barnes's counsel's choice of strategy was constitutionally deficient. Since his attorney had a "perfectly valid tactical reason[]" for pursuing this strategy, Barnes has not shown constitutionally deficient performance. *See id.* ¶ 42 (quotation simplified). And we need not consider prejudice, because Barnes's ineffective assistance claim fails on the first element. *See State v. Navarro*, 2019 UT App 2, ¶ 16, 438 P.3d 878 ("Because both deficient performance and resulting prejudice are requisite elements for a claim of ineffective assistance of counsel, failure to prove either element necessarily defeats the claim."), *cert. denied*, 455 P.3d 1053 (Utah 2019).

### III. Rule 23B Motion

¶47 Finally, Barnes asks us to remand the case to the trial court for supplementation of the record so that he can obtain support for additional claims of ineffective assistance of counsel. In particular, Barnes asserts that his attorney should have "investigate[d] and contact[ed]" two of Barnes's friends (Friends) who Barnes claims could have testified about "Stepdaughter's character for truthfulness." In addition, he asserts that his attorney should have allowed him to offer additional testimony while he was on the witness stand, including details about his relationship with Stepdaughter and her propensity to lie about issues large and small.

¶48 Rule 23B of the Utah Rules of Appellate Procedure "provides a mechanism for criminal defendants to supplement the record with facts that are necessary for a finding of ineffective assistance of counsel but which do not appear in the record." *State v. Griffin*, 2015 UT 18, ¶ 17, 441 P.3d 1166. "[A] defendant's motion seeking rule 23B remand must meet several requirements: (1) it must be supported by affidavits alleging facts outside the existing record, (2) the alleged facts must be non-speculative, and (3) the alleged facts, if true, must establish both elements of a traditional ineffective-assistance claim, i.e., counsel's deficient performance and resulting prejudice." *State v. Tirado*, 2017 UT App 31, ¶ 14, 392 P.3d 926; *see also* Utah R. App. P. 23B(b).

¶49 Barnes submitted two affidavits with his motion. The first one is his own, and therein he asserts that he asked his attorney to contact Friends—individuals he knew from church—who he believed could have offered helpful testimony. Barnes avers that Friends told him that Stepdaughter, on one occasion, admitted to lying about her whereabouts. In particular, Stepdaughter apparently had told Barnes that she was "going to the mall," but told Friends that she had instead "met up with friends." Barnes recounts that Friends told him that Stepdaughter then told them

that she was "a really good liar." Barnes also claims that his attorney told him that, despite Barnes's request that he contact Friends, he "was not going to look for [Friends] or ask them their opinion of [Stepdaughter's] character for truthfulness."

¶50     Also in his affidavit, Barnes alleges that there was "a lot more that [he] would have liked to have told the jury" during his trial testimony. In particular, he would have liked to explain the basis for a statement he made to the jury that Stepdaughter was "a good girl." And he would have liked to say more about the "challenges" of raising his children, including Stepdaughter. He also wanted to explain how Stepdaughter was "quite rebellious for many different reasons," and that she sometimes "lie[d]" about various things "to get people to like her."

¶51     The second affidavit Barnes submitted is from an investigator who avers that, in 2021 and again in 2022, he attempted to find Friends but was unsuccessful.

¶52     Barnes's first argument, in connection with his rule 23B motion, is that his attorney rendered ineffective assistance by failing to follow up with Friends. But Barnes has not met his burden of demonstrating entitlement to remand, because Barnes has not shown that Friends would have had anything admissible and material to say at trial. Barnes has not submitted an affidavit from Friends, presumably because he cannot locate them. We recognize that Barnes was not necessarily required to submit an affidavit from Friends. *See Griffin*, 2015 UT 18, ¶ 27 (rejecting a requirement, in connection with rule 23B motions, that a defendant must submit an affidavit from the witness in question). But he was required to set forth—in an affidavit from *someone*— that Friends would have had some admissible and helpful testimony to offer. And he has not done so.

¶53     In his motion, Barnes claims that Friends' testimony would have been important because they could have testified "about Stepdaughter's character for truthfulness." But the State correctly

points out that "Barnes's affidavit does not allege that [Friends] had an admissible opinion on Stepdaughter's credibility generally, or what that opinion was, or that Barnes told counsel that they had such an opinion." It would be speculative to assume, based on the affidavit provided, that Friends even have an opinion about Stepdaughter's general reputation for truthfulness, let alone what that opinion might be. Stated another way, Barnes cannot prevail in a rule 23B motion regarding Friends' capacity to testify to Stepdaughter's general reputation for truthfulness without submitting an affidavit, from someone, attesting that Friends had testimony to offer on the topic.

¶54   Rather than offering information about what Friends would have had to say about Stepdaughter's general reputation for truthfulness, Barnes's affidavit offers two specific anecdotes: (1) that Stepdaughter had once told Friends that she had lied to Barnes about her whereabouts and (2) that Stepdaughter told Friends that she considered herself a "really good liar." Evidence that Stepdaughter had apparently once lied to Barnes about going to the mall would not have been admissible. *See State v. Carrera*, 2022 UT App 100, ¶ 68, 517 P.3d 440 ("Rule 608(a) of the Utah Rules of Evidence prohibits any testimony as to a witness's truthfulness on a particular occasion." (quotation simplified)), *cert. denied*, 525 P.3d 1264 (Utah 2023). And there is no need for a rule 23B remand regarding Stepdaughter's statement about being a "really good liar," because Stepdaughter took the stand at trial and could have been asked about that statement. Barnes does not allege, in his affidavit, that he asked counsel to cross-examine Stepdaughter about that statement, and he does not assert, in his motion, that counsel was ineffective for not doing so. And we are unpersuaded, in any event, that there is a reasonable likelihood that the trial would have come out differently had counsel asked Stepdaughter about that statement.

¶55   For these reasons, Barnes's first rule 23B argument fails. He has not provided any nonspeculative extra-record facts about

whether Friends held an opinion about Stepdaughter's general reputation for truthfulness. And the remainder of his allegations in this regard either could have been raised during trial or concern evidence that would have been inadmissible in any event.

¶56    Barnes's second allegation, in connection with his rule 23B motion, is that his attorney should have asked him additional questions and allowed him to provide additional information about his relationship with Stepdaughter and that she sometimes lied to people about various things. But in his affidavit, Barnes does not assert that he ever told his attorney about this information or that he wanted to present it. And we note that Barnes was asked a number of open-ended questions at trial, and could have availed himself of the opportunity to add at least some of this information during his trial testimony. Under such circumstances, Barnes has not borne his burden of demonstrating that his attorney performed deficiently, even if we assume that the allegations in Barnes's affidavit are true.

¶57    For all of these reasons, the facts in the affidavits attached to Barnes's rule 23B motion do not establish deficient performance or prejudice. We therefore deny Barnes's motion.[2]

CONCLUSION

¶58    Stepdaughter's testimony was not inherently improbable, and can therefore be considered in our sufficiency-of-the-evidence analysis. With Stepdaughter's testimony included, we conclude that the State presented sufficient evidence to support

---

2. Barnes also brings a cumulative error challenge on appeal. Because we do not see any single error, Barnes cannot succeed in a cumulative error challenge. *See State v. Modes*, 2020 UT App 136, ¶ 12 n.5, 475 P.3d 153 ("Because we conclude that there are no errors to accumulate here, the cumulative error doctrine is inapplicable in this case." (quotation simplified)).

both of Barnes's convictions. Additionally, Barnes's trial attorney did not render ineffective assistance by electing to forgo a request for a lesser-included-offense instruction. And we deny Barnes's motion for a rule 23B remand.

¶59    Affirmed.

———————