**2024 UT App 140**

### THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
BRETT LEONARD ORTON,
Appellant.

Opinion
No. 20220119-CA
Filed October 3, 2024

Second District Court, Farmington Department
The Honorable David J. Williams
No. 181702388

Scott L. Wiggins, Attorney for Appellant

Sean D. Reyes and Emily Sopp,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN M. HARRIS and JOHN D. LUTHY concurred.

MORTENSEN, Judge:

¶1 Brett Leonard Orton pled guilty to sexually abusing two of his girlfriend's daughters. And although he pled guilty to only two counts of sodomy for the abuse of these two children, along with one count of lewdness involving a third daughter, there appears to be no dispute that he abused the daughters on many occasions over many years—one of the daughters stated that Orton had abused her "thousands of times." Further, the record indicates that he abused or attempted to abuse other children as well. In this appeal, Orton challenges the sentence pronounced by the district court, asserting instances of misconduct that he believes tainted his sentencing. We reject these challenges and affirm the sentence.

BACKGROUND

¶2 Beth[1] mistakenly viewed Orton, whom her mother was dating, as a "protector" and "father figure." But by the time she was twelve, Orton had sexually abused Beth "thousands of times," and the abuse continued until she was an adult. The abuse occurred on a "nightly" basis over the years. She stated that Orton performed oral sex on her and made her perform oral sex on him. He also touched her breasts and vagina. And when Beth was about sixteen years old, Orton started forcing her to engage in sexual intercourse, often using alcohol and marijuana to aid in the "manipulation process." Orton threatened to hurt Beth or her family if she told anyone about the abuse. He also gave her money after molesting her. She remembers Orton telling her that "he was going to teach [her] to be a good girlfriend for the boys," and she recalls thinking that "all fathers did this." "[T]o this day," Beth says that she "cannot get clean enough" to rid her of the memories of the abuse she suffered at Orton's hands. She now suffers from PTSD, depression, anxiety, and an eating disorder because of the abuse.

¶3 Orton also abused Beth's older sister, Anna, from when she was about thirteen years old until she was an adult. She remembers "waking up during the night . . . to find [Orton] in her room putting his penis in her face" and making her "perform oral sex on him." Anna also reported that Orton would "touch her breasts and genitals and make her touch his penis." As he did with Beth, Orton threatened to hurt Anna and her family if she told anyone about the abuse, paid her money after abusing her, and plied her with alcohol prior to abusing her. She said this abuse occurred "on multiple occasions during her teenage years" and that it was "ongoing and continued" into her twenties. In fact, even until shortly before the time Orton was charged—when Anna was in her late twenties—Orton continued to contact her

_____

1. We employ pseudonyms for the victims.

and asked her to engage in sexual acts in exchange for money. Anna states that Orton has "destroyed [her] soul" and caused her to feel like she was living "in hell" and "haunted by him."

¶4      Orton also attempted to abuse Cindy, Beth and Anna's younger sister. When Cindy was about fifteen years old, Orton offered to pay her $600 if she let him perform oral sex on her. She declined. Undeterred, Orton continued to ask Cindy to perform sexual acts in exchange for money over the years up until shortly before he was charged—when Cindy was in her mid-twenties.

¶5      Orton was alleged to have sexually abused other children as well. Orton allegedly forced one victim, a twelve-year-old boy, to perform oral sex on Beth, who was about eleven at the time, while Orton filmed the act with his cell phone. Another victim alleged that Orton had put his hands down her pants and touched her genitals when she was about fifteen while visiting the Orton home. She said she "froze in fear" and Orton warned her not to tell anyone about the incident. And yet another victim reported that Orton allegedly gave her and Beth alcohol to the point that Beth got sick, allowing Orton to be alone with her and ask if he could perform oral sex on her, which she declined.

¶6      Orton was charged with five counts of sodomy of a child, four counts of aggravated sexual abuse of a child, two counts of rape, one count of attempted forcible sodomy, and one count of forcible sexual abuse. But as part of a plea agreement, Orton pled guilty to only two counts of sodomy of a child for his abuse of Beth and Anna and one count of forcible sexual abuse, which was reduced to lewdness, for his actions against Cindy. The State agreed to dismiss all the other charges. The plea agreement contained the following bargain:

> The State agrees that at sentencing, [Orton's] counsel will argue that the sentence, on the first degree felonies be 6–life, while the State will argue for a sentence of 10–life. The State further agrees it

will not argue for the 15–life, however, the victims will be allowed to argue for whatever sentence they desire. Both sides agree that each can argue their respective positions regarding concurrent vs. consecutive.

¶7 At sentencing, Orton's counsel (Counsel) acknowledged that the court had the discretion to impose a prison sentence of six years to life, ten years to life, or fifteen years to life. But Counsel noted that "[t]hrough negotiations with the State, it was agreed upon that the 15-to-life would not be argued" by either side. Given this agreement, Counsel urged the court "to consider" concurrent terms of six years to life for the two felony charges, noting that Orton had "taken responsibility" for his "morally reprehensible" actions.

¶8 After Counsel spoke, the district court asked for clarification on the mandatory length of the sentence. Reading the relevant code section, the court wondered whether the mandatory sentence was twenty-five years to life. *See* Utah Code § 76-5-403.1(3). Given this statute, the court asked if there had "been a stipulation as part of the plea agreement that this [was] not a 25-to-life case." The parties clarified that there had been a change in the sentencing statute in 2008, increasing the mandatory minimum to twenty-five years to life. *See* Act of Feb. 14, 2008, ch. 179, § 5, 2008 Utah Laws 1288, 1290. Because Orton's offenses all occurred before that sentencing amendment, the parties clarified that he was subject to the six-, ten-, or fifteen-year-minimum sentence rubric and that he was not subject to a twenty-five-year-minimum sentence. *See* Utah Code § 76-5-403.1 (2007).

¶9 The prosecutor then proceeded to ask the court to impose sentences of ten years to life to run consecutively, noting that the sentence was reasonable due to the "number of victims" and the "extreme gravity of these circumstances." The prosecutor

supported his argument for ten-year-minimum sentences to run consecutively by noting,

> Your Honor, as we've already discussed today, the legislature has felt that these types of actions are 25 to life, but that was after 2008. But I think it's probative of their thinking of how serious these offenses are.

¶10    Thereafter, Beth and Anna addressed the court and detailed the abuse Orton had inflicted on them and how it continued to negatively affect their lives. Each asked for fifteen-year-minimum sentences. And the victim advocate, after reviewing the severity of Orton's abuse of the victims, noted that "the legislature in 2008, 13 years ago, knew that 6, 10, or 15 years for this kind of activity against our most precious among us, our children, is not enough, and they have moved it to 25 to life." Having made that point, the victim advocate asked the court to impose consecutive sentences of fifteen years to life.

¶11    In his rebuttal, Counsel stated,

> I . . . take issue with the fact that it's been presented, albeit not directly, but I think indirectly that because the statute has changed and the legislature now sees these types of crimes as 25 years to life, that in some way gives Your Honor incentive to give the top end here on a 6, 10, or 15. This simply isn't and should not be applied to this case.

¶12    The court sentenced Orton to consecutive terms of fifteen years to life. The judge noted that Orton's offenses had been "the worst crime" he had "seen so far" in his three years on the bench. He told Orton that the reason for the sentence was the "heinous nature" of the crimes and that it would not "be in the interest of justice to impose any sentence other than the maximum," especially "given the facts of the case" and the "impact" Orton's

abuse had on his victims. The judge also noted that the sentence would allow Orton to "get the help that [he] obviously need[ed]."

ISSUES AND STANDARDS OF REVIEW

¶13   Orton appeals and raises two issues for our consideration. First, he asserts that the district court erred in failing to remedy alleged "prosecutorial misconduct," which he says occurred when the prosecutor presented "false evidence" that the legislature had increased the minimum sentence for Orton's offense to twenty-five years. Because Orton did not raise a prosecutorial-misconduct complaint below, we review this issue for plain error. *See State v. Legg*, 2014 UT App 80, ¶ 8, 324 P.3d 656.[2] "Plain error is a question of law reviewed for correctness." *State v. Popp*, 2019 UT App 173, ¶ 19, 453 P.3d 657 (cleaned up).

---

2. Orton insists that this issue was preserved when Counsel said that he "[took] issue" with the prosecutor referencing how the statute had changed and noting that doing so might provide the court with "incentive" to impose a harsher sentence. *See supra* ¶ 11. We think the issue of prosecutorial misconduct sounding in the presentation of false evidence was not preserved by this rather oblique objection, at least not to a degree that it would have given the district court an opportunity to rule on the matter. "An issue is preserved for appeal when it has been presented to the district court in such a way that the court has an opportunity to rule on it." *State v. Oliver*, 2018 UT App 101, ¶ 13, 427 P.3d 495 (cleaned up). For that reason, we review this issue under the rubric of plain error. But given that we determine that no error took place at all and that even if one did, Orton suffered no harm, it doesn't really make any difference whether we review this issue as preserved error or plain error. *See State v. Cruz*, 2016 UT App 234, ¶ 52, 387 P.3d 618 ("Whether the appellant asserts preserved error or plain error—that is, whether the appellant claims to have objected to

(continued…)

¶14 Second, Orton claims that Counsel rendered ineffective assistance by failing to request that the court "disavow" any consideration of the twenty-five-year-sentence amendment and by failing to move to disqualify the sentencing judge. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Lisenbee*, 2022 UT App 19, ¶ 8, 505 P.3d 523 (cleaned up).

ANALYSIS

I. Plain Error

¶15 Orton asserts that the district court plainly erred in failing to remedy what he characterizes as "prosecutorial misconduct," which he alleges occurred when the State referred to the legislature's change in the statute to make the top-end minimum sentence twenty-five years—even though that change was inapplicable to Orton's sentencing. Orton argues that had the court "recognized" and "remedied" this alleged misconduct, "it is reasonably likely that the sentencing proceedings would not have been necessarily tainted by the false evidence utilized by the State and" the victim advocate.

¶16 "To demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful. If any one of these requirements is not met, plain error is not established." *State v.*

---

the alleged error or claims that the alleged error was so obvious that no objection was required—the appellant must demonstrate prejudice or harm to prevail."); *see also State v. Diviney*, 2021 UT App 106, ¶ 26, 500 P.3d 883 ("Utah law places the burden on the defendant to prove that a preserved error is harmful." (cleaned up)).

*Johnson*, 2017 UT 76, ¶ 20, 416 P.3d 443 (cleaned up). Our supreme court has clarified that in the context of prosecutorial misconduct, "our plain error analysis asks not whether *the prosecutor* made a misstep that could be characterized as *misconduct*, but whether the *trial court* made an 'obvious' error in its decision." *State v. Hummel*, 2017 UT 19, ¶ 105, 393 P.3d 314. This doesn't mean that the "extent of a prosecutor's 'misconduct' is irrelevant" to a plain-error analysis. *Id.* ¶ 108. Rather, the "more plain or obvious the prosecutor's misstep, the greater the likelihood (other things being equal) that an appellate court would find plain error in a judge's failure to step in to stop it." *Id.* "It goes too far, however, to suggest that every misstep of a prosecutor should be corrected by the trial judge—or in other words that it is always plain error by the judge not to step in when the prosecutor oversteps his bounds." *Id.* ¶ 109. Here, Orton cannot show either that any error occurred or that he was prejudiced by the error he alleges.

A.    No Error

¶17    The court did not err by electing not to step in, sua sponte, and take action in the wake of the prosecutor's reference to the legislative change in sentencing because the prosecutor's statement did not constitute "false evidence" as Orton alleges. The prosecutor told the court that the legislature had increased the top-end minimum sentence for crimes like Orton's to twenty-five years, arguing that the change was "probative of [the legislature's] thinking of how serious these offenses are." There was no suggestion that the longer sentence in the 2008 statutory amendment applied to Orton. In fact, that it did not apply had been explicitly clarified when the court brought up the longer sentence just a few minutes earlier. The prosecutor revisited the sentencing amendment to drive home the State's point that Orton should receive consecutive ten-year-minimum sentences, as the State had agreed to argue in the plea deal. Nothing in the prosecutor's reference to the inapplicable amendment was factually false. Rather, the prosecutor made clear that the

amendment did not apply to Orton and that he was using the new statute to support the State's position for the ten-years-to-life sentence it had bargained for in the plea agreement. We fail to see how this reference amounts to "false evidence," and we therefore conclude that it did not amount to prosecutorial misconduct. Without any foundational error for the court to remedy, Orton's claim of plain error obviously fails from the start.

B.      No Prejudice

¶18     In any event, Orton has not demonstrated prejudice. Given the absence of any error at all, we need not explore the prejudice prong to resolve the plain error issue, *see State v. Fouse*, 2014 UT App 29, ¶ 28, 319 P.3d 778 ("Because we determine that no error occurred, we do not reach the remaining prongs of plain error analysis."), but we choose to do so here because we resolve the claim of ineffective assistance of counsel below, in part, on the basis of lack of prejudice.

¶19     First, given the heinous and extensive nature of the sexual abuse Orton inflicted on his victims, there is no reasonable probability that he would have received a more favorable sentence absent the prosecutor's reference to the inapplicable amendment. The reason the district court imposed the maximum sentence had nothing to do with the prosecutor's reference. Instead, the court made explicit that the "interest of justice," the "heinous nature" of the abuse, and the impact of the abuse on the victims were the reasons it was imposing the fifteen-year-minimum sentences. Orton does not attempt to explain why, in light of this expressly articulated reasoning, the court would have imposed a more favorable sentence had it chosen to sua sponte intervene and "disavow" the prosecutor's comments. Given the egregious nature of Orton's abuse of the victims and the articulated basis for the court's ruling, we see no reasonable probability of a different result had the district court taken the actions Orton now asserts it should have taken.

¶20   Second, Orton has not shown how the district court's intervention after the references by the prosecutor would have resulted in a lesser sentence given that the court was already well aware of the inapplicable amendment. Indeed, it was the sentencing judge who first brought up the twenty-five-year-minimum sentence. Both parties clarified that the amended statute did not apply to Orton. "As a general rule, we presume that the district court made all the necessary considerations when making a sentencing decision." *West Valley City v. Walljasper*, 2012 UT App 252, ¶ 27, 286 P.3d 948 (cleaned up). And "[u]nless the record indicates otherwise, we presume that the trial court knew the law." *Id.* Because the court was already aware of the inapplicable amendment, we see scant possibility of any additional benefit accruing to Orton had the court explicitly acknowledged that it would disavow any reliance on the new statute in imposing Orton's sentence. There is every reason to conclude that the court understood perfectly the sentencing that applied to Orton and acted accordingly.

¶21   Third, Orton has offered no evidence indicating that the district court actually relied on the twenty-five-year-sentence amendment in imposing the sentence. In *State v. Howell*, 707 P.2d 115 (Utah 1985), the sentencing judge mentioned that he had received ex parte phone calls and a letter regarding the defendants' actions. *Id.* at 117. However, there was no indication that the information had "been part of the judge's deliberative processes." *Id.* at 119; *see also State v. Moa*, 2012 UT 28, ¶ 37, 282 P.3d 985 ("Because there was no affirmative representation by the judge, we concluded that there was no evidence that these items were part of his deliberative process." (cleaned up)). So too here. While there is no doubt that the court was made aware of the inapplicable amendment (indeed, the court was the one who broached the issue), there is equally no indication that the court was swayed by that awareness or that the awareness became part of the court's deliberative process. The court made no subsequent mention of the longer sentence. Instead, the court was swayed by

what it did mention—the "heinous nature" of the abuse, the profound impact of that abuse on the lives of Orton's victims, the "interest of justice," and the opportunity for Orton to get the help he so "obviously" needed. Given these express concerns, it's clear that the court would have imposed the maximum sentence available to it even if it had explicitly disavowed relying on the inapplicable amendment.

¶22    In sum, Orton has not shown that the district court erred in electing not to intervene and take additional action after the prosecutor mentioned the amended statute. Nor has he shown how he was harmed by the court's election to not take such action. Accordingly, his first claim of error fails.

## II. Ineffective Assistance of Counsel

¶23    Orton also asserts that Counsel rendered ineffective assistance for failing to properly object to the alleged prosecutorial misconduct and failing to move to disqualify the sentencing judge. To establish ineffective assistance of counsel, Orton must show that Counsel's performance fell below an objective standard of reasonable representation and that this deficiency prejudiced him. *See State v. Rosen*, 2021 UT App 32, ¶ 8, 484 P.3d 1225. "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [an ineffective assistance claim] under either prong." *Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182.

¶24    Orton suffered no prejudice by Counsel's failure to further object to the prosecutor's reference to the 2008 statutory amendment for the same reasons identified in our plain error analysis. But to reiterate, the record indicates that the court would have imposed the fifteen-year-minimum sentence due to the "heinous nature" of the abuse, the "interest of justice," and the impact of the abuse on the victims regardless of whether Counsel had asked the court to expressly disavow any reliance on the prosecutor's reference to the longer sentence. To put it bluntly, the

die was cast not by the prosecutor's statement but by the extent of Orton's sexual abuse of the victims. Given the egregious nature of Orton's crimes, it is simply not reasonably probable that any additional objection—no matter how eloquent or legally sophisticated—would have made a difference.

¶25 Nor has Orton shown Counsel was ineffective in not moving to disqualify the judge. "Because the decision not to pursue a futile motion is almost always a sound trial strategy, counsel's failure to make a motion that would be futile if raised does not constitute deficient performance." *State v. Torres*, 2018 UT App 113, ¶ 16, 427 P.3d 550 (cleaned up). Counsel acted reasonably in expressing his displeasure with the prosecutor's reference and leaving the situation at that. In particular, he would have known that there was no basis to file a motion to disqualify a judge simply because that judge had heard a prosecutor repeat information the judge already knew. The Utah Code of Judicial Conduct states that a "judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." Utah Code Jud. Conduct R. 2.11(A). Included in this rule is a circumstance where a judge has "a personal bias or prejudice concerning a party." *Id.* R. 2.11(A)(1). The Utah Code of Judicial Conduct defines impartiality as the "absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as presence of an objective and open mind in considering matters that come before a judge." *Id.* Terminology. Moreover, "bias and prejudice are only improper when they are personal. A feeling of ill will or, conversely, favoritism toward one of the parties to a suit are what constitute disqualifying bias or prejudice." *In re Young*, 1999 UT 81, ¶ 35, 984 P.2d 997 (cleaned up).

¶26 There was no hint of bias or prejudice here—personal, perceived, or otherwise. Orton has pointed to nothing in the Utah Code of Judicial Conduct or our case law that suggests a judge's mere knowledge of an inapplicable statutory increase in a

sentence creates a foundation for a claim of bias, prejudice, or partiality. And as we have pointed out, nothing in the judge's behavior indicated that he was in any way swayed or influenced by the prosecutor's mention of the 2008 amendment. Simply put, Orton has articulated no appearance of bias on the part of the judge—a necessary element for a successful motion to disqualify.

¶27 Orton has not shown he was prejudiced by Counsel's decision to not object to the alleged prosecutorial misconduct. And Counsel did not render deficient performance when he did not move to disqualify the judge after the prosecutor's statement. Accordingly, Orton's ineffective assistance of counsel claims fails.

## CONCLUSION

¶28 Orton has failed to show that the district court plainly erred in not electing to sua sponte intervene after the alleged prosecutorial misconduct. His claims of ineffective assistance of counsel fail for lack of prejudice and because Counsel did not perform deficiently. Affirmed.

———————