**2024 UT App 184**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
KEITH NELSON BROADWATER,
Appellant.

Opinion
No. 20220529-CA
Filed December 19, 2024

Eighth District Court, Duchesne Department
The Honorable Samuel P. Chiara
No. 211800093

Benjamin Miller and Debra M. Nelson,
Attorneys for Appellant

Sean D. Reyes and Lindsey Wheeler,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and JOHN D. LUTHY concurred.

HARRIS, Judge:

¶1 Keith Nelson Broadwater shot and killed his longtime roommate (Roommate) following an apparent altercation. He claimed he did so in self-defense, but a jury convicted him of murder and unlawful discharge of a firearm. Broadwater now appeals those convictions, raising one preserved issue challenging a restriction the trial court placed on his attorney during closing argument, and making various other claims of ineffective assistance of counsel and plain error. For the reasons discussed in this opinion, we affirm Broadwater's convictions.

BACKGROUND[1]

¶2 Broadwater and Roommate first started living together in 2008 or 2009, when they were both working at the same company. Over the ensuing years, they lived together on multiple occasions in various places in Utah. Broadwater testified that he and Roommate had a generally positive relationship, despite occasional differences, and would often go out to dinner together and sometimes even travel together out of state.

¶3 In 2021, Broadwater and Roommate were living together in a four-bedroom house, and in early March Roommate's on-again-off-again girlfriend (Girlfriend) came to stay with Roommate at the house. Broadwater occupied the house's primary bedroom, and Roommate (and Girlfriend) occupied a second bedroom down a hallway. Along the hallway between the two rooms, there was another bedroom and a bathroom. This third bedroom was used for storage of various items; Broadwater testified at trial that the items stored there included two guns, and he sometimes referred to that room as the "gun room."

¶4 Shortly after Girlfriend came to stay at the house, she and Roommate got into a dispute; Girlfriend came to believe that Roommate had stolen her purse, and she even called the police to report the alleged theft, but she located the purse soon thereafter and it turned out not to have been stolen. In her report to police, though, Girlfriend stated that she and Roommate had been "having words." Broadwater was displeased with the entire episode, and he indicated to Roommate that he didn't "want

---

1. "In an appeal from a jury trial, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, and we present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Kufrin*, 2024 UT App 86, n.1, 551 P.3d 416 (quotation simplified).

[Girlfriend] around" and told both Roommate and Girlfriend that Girlfriend "ha[d] to go."

¶5    On March 17, 2021, Roommate went to work, but Broadwater and Girlfriend remained at the house. Girlfriend worked from home in Roommate's room, but Broadwater had the day off, and he spent the day "doing chores around [the] house" and drinking beer. After Roommate got home from work around five o'clock, he and Girlfriend decided to go out for the evening to celebrate St. Patrick's Day. Roommate invited Broadwater to go with them, but Broadwater declined. At this point in the day, Girlfriend thought Broadwater was already "intoxicated" and "acting belligerent"; Broadwater testified that, while he could not remember how many beers he had consumed throughout the day, he was "buzzed" but not drunk.

¶6    While Roommate and Girlfriend were out, Broadwater watched television and eventually went to bed around 10:30. He testified that when he went to bed, he was "feeling buzzed" but was not intoxicated or "having trouble walking or speaking."

¶7    Girlfriend and Roommate returned to the house around midnight; the lights in the house were off, and Broadwater was apparently asleep in his room. Girlfriend and Roommate went to their room and were laughing and talking. This activity awakened Broadwater, who claims to have heard "[y]elling"; displeased at having been awakened, Broadwater got up and "turned the hallway light . . . on and off" to "let them know to be quiet." Girlfriend also remembered that "the hall light kept going off and on" and that she heard "some mumbling from [Broadwater]." Nonetheless, she testified she was not "worried about what he was saying," and that she was on the floor "sipping on a can" while Roommate was on the bed "smoking some weed or something." As Broadwater recounted it, however, the noise did not cease, so he went to Roommate's room and knocked on the door "to tell them to shut up." Girlfriend later recalled that

Broadwater's knock "wasn't a regular knock" but was "heavier," causing her to believe that "he knocked on the door with [a] gun." In response to the knock, Roommate opened the door, stepped into the hallway, and started talking to Broadwater. A minute or two later, a shot rang out, and Roommate fell to the ground, fatally wounded.

¶8   Broadwater and Girlfriend, who both testified at trial, offered somewhat different—and sometimes self-contradictory—accounts of what happened. As Girlfriend recounted it, Roommate and Broadwater were speaking in or near the doorway to Roommate's room; it is unclear from Girlfriend's testimony whether Roommate was standing directly in the bedroom's doorway or was further into the hall. On direct examination, she twice confirmed that Roommate went "out in the hallway." On cross-examination, she reiterated that Roommate "went out of the room" after answering the knock at the bedroom door and that Roommate and Broadwater "were having a conversation in the hall." Later, however, in response to additional cross-examination questions, she testified that Roommate was standing "in the door jam" during the entire discussion and when the shot was fired. But she stated that she was distracted during the incident—she was looking at her phone and listening to music—and that she only "look[ed] up" at them twice during their discussion.

¶9   She testified that Roommate didn't ever "do anything to try and attack" Broadwater during their discussion. She stated that—although she could not hear most of the details of what they were saying—the conversation the two men were having was not a heated one and that neither seemed upset or was cursing. Eventually, though, she heard Roommate ask Broadwater, "Why do you have a gun?" Then Girlfriend heard a "pop," looked up, and saw that Roommate had been shot.

¶10   For his part, Broadwater testified that after he knocked on Roommate's bedroom door, he turned around and was walking

back toward his room at the other end of the hallway. When he was about "halfway back" to his room, Roommate opened the door and expressed annoyance at Broadwater's knock. Broadwater responded by stating that Girlfriend had been asked to move out and was not even supposed to be living in the house. In Broadwater's telling, this made Roommate visibly angry, and he threatened to "fuck [Broadwater] up" and began walking toward Broadwater in a menacing manner, with his fists clenched. Broadwater claims that, at this point, he believed that Roommate was going to punch him, and so he started backing up toward his room. He testified that he was nervous he would not be able to defend himself against Roommate, for several reasons. For one, Roommate was a big man, weighing about 380 pounds, some 150 pounds more than Broadwater. Additionally, Broadwater testified that Roommate had previously "bragged" that he could knock someone out with one punch.

¶11 Broadwater stated that he eventually backed up all the way into his room, because Roommate had advanced to the threshold to Broadwater's room and stated he would "fucking kill" Broadwater. At that point, Broadwater "grabbed a gun" from the closet of his bedroom. When he turned around, Broadwater saw that Roommate had walked back down the hall toward the storage room, which Broadwater believed contained two guns, and he had "started to open [the door]" to that room. Broadwater worried that Roommate was "getting a gun," so he entered the hallway again, stopping about four or five feet from Roommate, who was still standing next to the storage room. The two men exchanged additional words, and then— according to Broadwater—Roommate moved aggressively toward him, with his hands "coming up" as if he was going to take Broadwater's gun. Broadwater claims that, when Roommate was so close it "almost seemed like [the gun] was touching" Roommate, Broadwater shot Roommate one time in the chest.

¶12 After Roommate was shot, both Broadwater and Girlfriend called 911. While on the phone with first responders, Broadwater repeated variations of the phrase, "I shot him." Broadwater also told the 911 operator that Roommate had "threatened" and "challenged" him. Multiple officers arrived on the scene, took Broadwater into custody, and attempted to render lifesaving aid to Roommate. Officers noted that Broadwater seemed intoxicated but was very cooperative with officers; indeed, he said to them, "I can't believe I shot him." Aid was unsuccessful, however, and Roommate died at the house.

¶13 Following Roommate's death, officers investigated the incident. They recovered the bullet and its shell casing, and in Roommate's room they found a prescription in Roommate's name for glipizide, a diabetes medication. On the prescription bottle there was a notice that the patient should avoid alcohol while taking glipizide. Officers found damage to the doorframe of Roommate's door, which they believed may have been caused by the bullet; that damage was located some 32 to 33 inches above the floor. The bullet itself was found down the hallway, indicating that it may have bounced off of the doorframe and into the hallway. The shell casing was found outside the bathroom door in the hallway. Officers found no sign of a fight or a struggle. A search of the house turned up some ammunition, but officers did not locate any other weapons—including in the "gun room"—although the searching officer later acknowledged that he "wasn't doing a deep and thorough search" of the house. Ultimately, an investigating detective testified that the evidence was "consistent with [Roommate] being shot in the hallway."

¶14 A medical examiner (Examiner) performed an examination and postmortem autopsy. As relevant here, Examiner noted a single gunshot wound on Roommate's torso, which Examiner determined was the cause of death. Examiner observed that the entrance wound, located on the front of Roommate's body, was located about four inches higher than the exit wound on the back

of his body; the entrance wound would have been about 50 inches above the floor, and the exit wound would have been about 46 inches above the floor. Examiner also noted "stippling" around the entrance wound, indicating that the wound was generated from "an intermediate range of fire, meaning that the gun was likely within several inches to feet" of Roommate's body at the time of the shooting. Finally, a toxicologic analysis determined that Roommate's blood alcohol content was 0.148 at the time of death. That same analysis did not detect any glipizide; if any was present, it was "below the level of detection."

¶15 The State eventually charged Broadwater with two first-degree felonies: murder, and discharge of a firearm with serious bodily injury. The case proceeded to a three-day jury trial. In support of its case-in-chief, the State elicited testimony from Girlfriend, Examiner, and several law enforcement officers. Girlfriend testified about the events in question, as described above, and her testimony was in some respects both internally inconsistent as well as inconsistent with earlier statements she had made to officers. For instance, Girlfriend's trial testimony was internally inconsistent about where Roommate had been standing during the incident: on direct examination, she said he was "out in the hallway," but on cross-examination she testified that he was "in the door jam." Also, on the night of the incident, Girlfriend had denied that Roommate had been using drugs and, instead, she had asserted that it had been Broadwater who had been using drugs. But at trial, she testified that Roommate had been smoking "pot" on the night in question and that she had not seen Broadwater use drugs on the night in question or at any point in the month before Roommate's death. Furthermore, she had initially told officers that when Broadwater knocked on the door it sounded like a regular knock, but at trial she claimed that the knock was "really heavy" and that she believed Broadwater knocked on the door with the gun. And more generally, Girlfriend acknowledged on cross-examination

that she has sometimes been known to "embellish a story as [she is] telling it."

¶16    After the State's presentation of evidence, Broadwater's defense counsel (Counsel) made a limited motion for a directed verdict, asserting that the State had not presented sufficient evidence that the events in question "occurred within Duchesne County," and that the court therefore had no jurisdiction in the matter. The court denied the motion, concluding that sufficient evidence had been presented that the crimes with which Broadwater had been charged had occurred in Duchesne County. Broadwater made no other directed verdict motion.

¶17    Broadwater elected to testify—as recounted above—in his own defense. After the presentation of evidence, the court instructed the jury, and the attorneys offered their closing arguments. In its initial closing argument, the State asserted that Broadwater did not have the necessary "reasonable belief of imminent death or serious bodily injury" for his self-defense claim; in particular, it argued that Broadwater—who was, in his own words, worried about a "one-punch knockout"—could not have had a reasonable fear of death or serious bodily injury, because "there's no threat of death or serious bodily injury from a . . . one-punch knockout. You're not going to die being knocked out or being punched. That's not reasonable." Counsel lodged no objection to this line of argument.

¶18    During his closing argument, Counsel emphasized some of the inconsistencies in Girlfriend's account of events, and he highlighted her statement that she sometimes embellishes stories. Counsel also argued that Roommate had been ingesting certain substances on the evening in question and that these substances had "affect[ed] his thinking that night." He specifically mentioned alcohol—that Roommate was "intoxicated at a rate nearly three times the legal limit for driving"—and cannabis. But when Counsel attempted to also mention glipizide as another substance

that could have affected Roommate's thinking because the prescription bottle said not to take it with alcohol, the State objected, referring to the toxicology screen and asserting that "[t]here's no evidence that [Roommate] actually took the glipizide." The court sustained that objection, and did not allow Counsel to continue arguing that glipizide might have affected Roommate's thinking that night. But Counsel was able to continue arguing that the other substances Roommate had ingested—including alcohol and cannabis—influenced Roommate and affected his thinking.

¶19 Counsel also made extensive argument about bullet trajectory. He pointed out that the presumed bullet mark on the doorframe was located some 33 inches above the floor, but that the bullet exited Roommate's back about 46 inches from the floor. Counsel then stated that "from the time that the bullet left [Roommate's] body until it impacted the doorframe, it dropped by approximately 13 inches," and he argued from these facts that it was "not physically possible" for Roommate to have been standing in the doorframe when he was shot. He asserted that Girlfriend's testimony to that effect was therefore not believable, and he argued that these facts supported Broadwater's contention that Roommate had been coming at him from further down the hallway when the shot was fired.

¶20 Counsel also offered a response to the State's "one-punch knockout" comments. To start with, Counsel argued that it was "a reasonable thing" for Broadwater to be in fear of a 380-pound man "walking towards him closed fist" saying, "I'm going to beat you up." Then Counsel argued as follows:

> And the prosecutor said, well, that's not going to kill you. Maybe he'll one punch knock you out, but you won't die. Each of you ask yourselves in that situation, you're in your own home and somebody is going to knock you out and his conclusion is, well,

that's okay, you're not going to die from it. Is that reasonable to you? I don't think that is. I think you have a right to not be beat up in your own home.

¶21    In the State's rebuttal closing argument, the prosecutor responded to Counsel's bullet trajectory assertions. He pointed out that the bullet's entry wound was about 50 inches from the ground, meaning that the bullet had descended some four inches between its entry and exit points. He then hypothesized that Roommate's chest may have been "about a foot thick," and he began to argue about what that may have meant for Roommate's location. At this point, Counsel objected, pointing out that no facts were in evidence about the thickness of Roommate's chest. During a sidebar for which the record is partially missing (as "inaudible"), the court appears to have sustained Counsel's objection. At any rate, after the sidebar there was no further discussion of Roommate's exact chest size, but the State continued to argue about bullet trajectory generally, making the point that Roommate "couldn't have been all the way out to 10 feet" into the hallway "for the bullet to hit that doorframe at 32 and a half plus inches," because "[t]hat's only 13 inches down over a course of 10 feet where it had already dropped . . . almost 4 and a half inches just through [Roommate's] chest." The State summed the matter up by arguing that the bullet "evidence clearly doesn't support [Broadwater's] theory . . . that [Roommate] was all the way . . . out here at this door [either the bathroom door or the spare bedroom door] when he shot him. It's just not possible." Other than the objection to the State's assertions about Roommate's specific chest size, the record contains no indication that Broadwater lodged any objection to the State's arguments about bullet trajectory.

¶22    At the conclusion of argument, the jury began its deliberation, and it eventually found Broadwater guilty on both counts; in the process, it also made a specific determination that the State had proved, beyond a reasonable doubt, that Broadwater

had not acted in self-defense. Later, the trial court sentenced Broadwater to prison.

ISSUES AND STANDARDS OF REVIEW

¶23   Broadwater now appeals his convictions, and he asks us to consider three issues. First, he takes exception to the trial court's ruling preventing Counsel from arguing, during closing argument, that the jury could infer that Roommate had taken glipizide on the day of the crime. As far as we are aware, no Utah appellate court has yet discussed the proper standard of review in this situation, but other courts have, and "limitations placed by a [trial] court on closing arguments are reviewed by [appellate courts] only for abuse of discretion." *See United States v. Apperson*, 441 F.3d 1162, 1206 (10th Cir. 2006); *see also United States v. Wiley*, 93 F.4th 619, 631 (4th Cir. 2024) ("[W]e review a [trial] court's limitation on closing argument for abuse of discretion."), *cert. denied*, 144 S. Ct. 2648 (2024); 75A Am. Jur. 2d *Trial* § 447 (2024) ("The scope and substance of closing arguments are subject to control by the trial court, and . . . appellate courts will not reverse a trial court's decision absent an abuse of discretion."); *cf. State v. Gollaher*, 2020 UT App 131, ¶ 21, 474 P.3d 1018 ("We review a trial court's evidentiary rulings for an abuse of discretion, and we will not reverse the trial court's ruling on evidentiary issues unless it is manifest that the trial court so abused its discretion that there is a likelihood that injustice resulted." (quotation simplified)).

¶24   Next, Broadwater argues that the evidence was insufficient to disprove self-defense beyond a reasonable doubt. Broadwater recognizes that he failed to preserve this issue for appellate review; his directed verdict motion went only to a jurisdictional issue and not to the sufficiency of the evidence disproving self-defense. "When a party fails to raise and argue an issue in the trial court, it has failed to preserve the issue, and an appellate court will not typically reach that issue absent a valid exception to

preservation." *State v. Reid*, 2018 UT App 146, ¶ 16, 427 P.3d 1261 (quotation simplified). Here, Broadwater asks us to review this issue for plain error and ineffective assistance of counsel. "Plain error is a question of law reviewed for correctness." *State v. Popp*, 2019 UT App 173, ¶ 19, 453 P.3d 657 (quotation simplified). And "when a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Id*. ¶ 17 (quotation simplified).

¶25 Finally, Broadwater assails the propriety of the State's arguments, made during closing, about the bullet's trajectory and the reasonableness of fearing death or serious injury from a single punch. But Broadwater lodged no objection to these arguments at trial, and those objections are therefore not preserved for our review. As with the previous issue, Broadwater asks us to review these issues for plain error and ineffective assistance.

ANALYSIS

¶26 We first discuss the only issue preserved for appellate review: Broadwater's complaint that the trial court abused its discretion by not allowing Counsel to argue about glipizide during closing argument. We then address the unpreserved issues that Broadwater asks us to review for plain error and ineffective assistance of counsel.

I. The Preserved Issue: Limitation on Closing Argument

¶27 Broadwater challenges the trial court's ruling preventing Counsel from arguing, during his closing argument, that one of the substances that could have negatively affected Roommate's thinking on the night in question was glipizide. Broadwater correctly points out that attorneys have "considerable latitude" in

closing argument to discuss the evidence and ask the factfinder to draw reasonable inferences from it. *See Reid*, 2018 UT App 146, ¶ 49 (stating that attorneys have "considerable latitude" during closing argument "concerning the issues they raise and have the right to fully discuss from their perspectives the evidence and all inferences and deductions it supports" (quotation simplified)). But not all errors require reversal, and even if we assume—without deciding and merely for purposes of the discussion—that the trial court abused its discretion by limiting Counsel's argument in this way, we discern no prejudice as a result, and we reject Broadwater's argument on that basis.

¶28　We will not reverse an erroneous discretionary ruling "unless it is manifest that the trial court so abused its discretion that there is a likelihood that injustice resulted." *Gollaher*, 2020 UT App 131, ¶ 21 (quotation simplified). In a similar context, we have stated that "an error is harmless and does not require reversal if it is sufficiently inconsequential that we conclude there is no reasonable likelihood that the error affected the outcome of the proceedings." *State v. Zimpfer*, 2024 UT App 136, ¶ 58, 558 P.3d 111 (quotation simplified).

¶29　To determine whether there is a reasonable likelihood that the error affected the outcome of the proceedings, we envision a hypothetical trial in which Counsel was able to make the argument that glipizide—along with alcohol and cannabis—affected Roommate's thinking on the night in question. *See State v. Ellis*, 2018 UT 2, ¶ 42, 417 P.3d 86 (stating that "[p]rejudice analysis is counterfactual," and that when courts are deciding "whether a trial affected by error is reasonably likely to have turned out differently we have to consider a hypothetical—an alternative universe in which the trial went off without the error"). We assess whether, in the hypothetical trial, Broadwater would have been reasonably likely to obtain a different result.

¶30 On these facts, we perceive no reasonable chance that the trial would have turned out differently had the jury heard Counsel's additional argument about glipizide. Despite the limitation the court placed on his argument, Counsel was nevertheless able to make the point, by reference to two other substances (alcohol and cannabis), that Roommate's thinking may have been clouded during the incident. Adding to the argument a third substance—one that apparently is only problematic when mixed with one of the others (alcohol)—is unlikely to have materially moved the needle. In addition, the jury was already aware of the potential issues with glipizide because Counsel cross-examined Examiner about the drug and its effects, asking specifically about whether it "tends to amplify the effects of alcohol on the body." For this additional reason, allowing Counsel to re-emphasize the point during closing argument is unlikely to have changed the outcome.

¶31 Accordingly, we conclude that any error in limiting Counsel's closing argument about glipizide was harmless. On that basis, we reject Broadwater's preserved challenge to the court's ruling restricting Counsel's argument.

## II. Unpreserved Issues

¶32 Broadwater also raises several issues that were not preserved for appellate review, and he asks us to review these issues for plain error and ineffective assistance of counsel.

¶33 "To demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *State v. Carrera*, 2022 UT App 100, ¶ 22, 517 P.3d 440 (quotation simplified), *cert. denied*, 525 P.3d 1264 (Utah 2023).

¶34 To demonstrate ineffective assistance, a defendant must make a two-part showing. First, "the defendant must show that

counsel's performance was deficient," which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Second, "the defendant must show that the deficient performance prejudiced the defense," which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. A defendant must prove both elements to be successful. *See id*. Because "failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [such claims] under either prong." *State v. Popp*, 2019 UT App 173, ¶ 25, 453 P.3d 657 (quotation simplified). And if a claim is infirm under one of the prongs, then "the claim fails and the court need not address the other." *State v. Nelson*, 2015 UT 62, ¶ 12, 355 P.3d 1031.

¶35 To demonstrate deficient performance, the defendant must show that "counsel's representation fell below an objective standard of reasonableness." *Popp*, 2019 UT App 173, ¶ 26 (quotation simplified). In evaluating the reasonableness of counsel's actions, courts will often look to whether the actions counsel took were motivated by trial strategy. *See State v. Scott*, 2020 UT 13, ¶ 35, 462 P.3d 350 ("To be sure, the performance inquiry will often include an analysis of whether there could have been a sound strategic reason for counsel's actions."). And while "the ultimate question is not whether there was a possible strategic reason for counsel's conduct, but instead whether that conduct was objectively reasonable," *see id.*, "[i]f it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance," *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871. "Because the decision not to pursue a futile motion is almost always a sound trial strategy, counsel's failure to make a motion that would be futile if raised does not constitute deficient

performance." *State v. Orton*, 2024 UT App 140, ¶ 25, 558 P.3d 443 (quotation simplified).

¶36 Broadwater raises two categories of claims in this regard. First, he argues that the State's evidence was insufficient to disprove self-defense beyond a reasonable doubt, and he asserts that the trial court plainly erred by not sua sponte directing a verdict in his favor and that Counsel rendered ineffective assistance by not making a broader motion for directed verdict. Second, he argues that two lines of argument in the State's closing were improper, and he maintains that the trial court plainly erred by not sua sponte intervening and striking those lines of argument and that Counsel rendered ineffective assistance by not objecting to them. We discuss each category of claims in turn.

A.    Sufficiency of the Evidence

¶37 First, Broadwater asserts that the evidence was insufficient to disprove his self-defense theory. And in connection with this argument, Broadwater claims—citing *State v. Robbins*, 2009 UT 23, 210 P.3d 288—that Girlfriend's testimony was inherently improbable and therefore should not be considered in any sufficiency-of-the-evidence analysis. We see no merit in these arguments: there was no error at all by the trial court, and Counsel did not perform deficiently because reasonable counsel could have concluded that a *Robbins* motion and a directed verdict motion would have been futile.

¶38 When considering insufficiency claims that have a *Robbins* component, "our analysis has two parts." *State v. Barnes*, 2023 UT App 148, ¶ 19, 542 P.3d 108, *cert. denied*, 544 P.3d 459 (Utah 2024). First, we consider the evidence the movant claims is inherently improbable—here, Girlfriend's testimony—to assess "whether the challenged piece of evidence is of such a poor quality that it should be disregarded." *See State v. Jok*, 2021 UT 35, ¶ 30, 493 P.3d 665. Our determination of this question will dictate the

"dimensions of the universe of evidence" that may be considered in the ensuing sufficiency-of-the-evidence analysis. *Barnes*, 2023 UT App 148, ¶ 21 (stating that, "[g]iven the relationship between" the two parts of the argument, we should examine the "inherent improbability claim first, then address [the] sufficiency claim only after we know the dimensions of the universe of evidence we are allowed to consider"); *see also State v. Skinner*, 2020 UT App 3, ¶ 26, 457 P.3d 421 ("[A] defendant who raises [an inherent-improbability] claim . . . is asking the court, in conducting its sufficiency-of-the-evidence review, to examine only a particular subset of the admitted evidence, and to disregard certain witness testimony before undertaking that review.").

¶39 Second, we undertake our sufficiency analysis, considering all evidence that has not been excluded from consideration on grounds of inherent improbability. For instance, if we determine that the challenged testimony is inherently improbable, we "then determine if sufficient evidence remains under which a reasonable jury could have convicted." *See Jok*, 2021 UT 35, ¶ 30. "On the other hand, if we determine that the challenged evidence is not inherently improbable, our sufficiency-of-the-evidence analysis will include the challenged evidence." *Barnes*, 2023 UT App 148, ¶ 20. In that situation, we will consider "all admitted evidence to determine if some evidence exists that could support the verdict," since "it is ordinarily not the court's place to disregard any particular items of admitted evidence." *Skinner*, 2020 UT App 3, ¶ 25 (quotation simplified).

¶40 Turning first to the *Robbins* part of the analysis, then, we observe that testimony is considered "inherently improbable" only if it "run[s] so counter to human experience that it renders the testimony inappropriate for consideration in sustaining a finding of guilt." *See Jok*, 2021 UT 35, ¶ 36 (quotation simplified). Indeed, our supreme court has noted that labeling a witness's testimony as "inherently improbable" should be reserved for "rare cases." *See id.* ¶ 31; *see also State v. Rivera*, 2019 UT App 188,

¶ 23 n.6, 455 P.3d 112 ("A case which actually falls within the *Robbins . . .* rubric is exceedingly rare."). This is because "appellate courts typically do not make credibility determinations" and generally resolve any arguments about "conflicts in the evidence in favor of the jury verdict." *Jok*, 2021 UT 35, ¶ 28 (quotation simplified); *see also State v. Prater*, 2017 UT 13, ¶ 32, 392 P.3d 398 (stating that appellate courts "are not normally in the business of reassessing or reweighing evidence").

¶41    The test that we apply in considering whether testimony is inherently improbable is "whether the challenged piece of evidence is of such a poor quality that it should be disregarded as evidence." *Jok*, 2021 UT 35, ¶ 30. And in cases in which the State's case is "based primarily" on the challenged testimony, the analysis turns on "whether the testimony could support a conviction or whether reasonable minds must have entertained a reasonable doubt that the defendant committed the crime for which he or she was convicted." *Id.* ¶¶ 1, 19 (quotation simplified). In undertaking this inquiry, courts are to consider the situation as a whole, including the context in which the testimony was offered, and are not to consider themselves limited to any list of factors. *See id.* ¶ 32 (stating that there is no "strictly factored test"). There are three hallmarks of inherently improbable testimony that courts have often considered in their analysis: "material inconsistencies, patent falsehoods, and lack of corroborating evidence." *Id.*; *see also Prater*, 2017 UT 13, ¶ 38 ("It was the inconsistencies in the child's testimony *plus* the patently false statements the child made *plus* the lack of any corroboration that allowed this court to conclude that insufficient evidence supported Robbins's conviction."). But our supreme court has warned "against inflexible reliance on these [three] factors." *See Jok*, 2021 UT 35, ¶ 32. Courts are still allowed—and perhaps even encouraged—to examine these three factors, but courts must avoid robotic reliance on them. *Id.*

¶42    With these principles in mind, we address Broadwater's specific arguments regarding Girlfriend's testimony. His main complaint is that Girlfriend's statement that Roommate was standing "in the door jam" when he was shot was physically impossible given the bullet evidence. But as noted, Girlfriend's testimony was not entirely consistent on this score: during her direct examination by the State, she testified that Roommate was "out in the hallway," and she initially reiterated this even on cross-examination, stating that Roommate "went out of the room" after answering the knock at the bedroom door and that Roommate and Broadwater "were having a conversation in the hall." To be sure, she later testified on cross-examination, in response to follow-up questioning, that Roommate was standing "in the door jam" during the entire discussion and when the shot rang out. But her testimony cannot be said to be "physically impossible" given the fact that she wasn't entirely clear about where Roommate was standing when he was shot.

¶43    Which leads us to Broadwater's other complaint about Girlfriend's testimony: that it was "riddled with inconsistencies on nearly every meaningful detail." Girlfriend's testimony certainly did contain inconsistencies. *See supra* ¶¶ 8, 15. But as we have pointed out, "this is true with regard to many complaining witnesses; indeed, it would be a rare case in which defense counsel could identify no inconsistencies in the account given by the State's main witness." *Barnes*, 2023 UT App 148, ¶ 27. In order to constitute the sort of discrepancies that would raise inherent-improbability concerns, the inconsistencies in question need to be "[s]ubstantial." *See Robbins*, 2009 UT 23, ¶ 17 ("*Substantial* inconsistencies in a sole witness's testimony . . . can create a situation where the prosecution cannot be said to have proven the defendant's guilt beyond a reasonable doubt . . . ." (emphasis added)); *see also Prater*, 2017 UT 13, ¶ 39 ("The question of which version of [the witnesses'] stories was more credible is the type of question we routinely require juries to answer."); *In re J.R.H.*, 2020

UT App 155, ¶ 11, 478 P.3d 56 (stating that we do not "apply *Robbins* to garden-variety credibility questions, such as which witness to believe, or which version of a witness's conflicting account to believe").

¶44 In our view, the inconsistencies Broadwater identifies in Girlfriend's testimony do not rise to a level at which reasonable minds could not have believed the material portions of Girlfriend's account. Many of the inconsistencies—for instance, how "heavy" Broadwater's knock was or who had been taking drugs that night—involved tangential issues that had only indirect relevance to the issue at hand: whether Broadwater acted in self-defense. And even the major inconsistency—where Roommate had been standing when he was shot—involved a matter of perception about which a person could potentially simply be mistaken; indeed, Girlfriend also testified that she was distracted during the incident—she was looking at her phone and listening to music—and that she only "looked up" at the men twice during their discussion.

¶45 Like our supreme court similarly concluded in *Prater* and *Jok*, we conclude here that the inconsistencies in Girlfriend's testimony were not so pervasive and material as to render the entirety of her testimony inherently improbable. *See Jok*, 2021 UT 35, ¶ 40 (stating that the witness's statements "do not approach the level of inconsistency that may cause us to disregard a testimony"); *Prater*, 2017 UT 13, ¶ 39 (stating that "the inconsistencies in [the witnesses'] accounts by themselves are insufficient to invoke the inherent improbability exception" (quotation simplified)). "The question of which version of [Girlfriend's story] was more credible is the type of question we routinely require juries to answer." *See Prater*, 2017 UT 13, ¶ 39. Accordingly, we conclude that Girlfriend's testimony was not so inherently improbable as to deserve wholesale exclusion under *Robbins*. Had Counsel made a *Robbins* motion, it would quite likely have been denied; thus, reasonable counsel could have

decided not to bring such a motion. And for the same reasons, the trial court did not err by not sua sponte intervening to exclude Girlfriend's testimony.

¶46    Because Girlfriend's testimony is not subject to exclusion under *Robbins*, it must be included in the universe of evidence that we consider in our broader sufficiency-of-the-evidence analysis. And considering that testimony along with all the other evidence the State presented at trial, we conclude that the State presented sufficient evidence for a jury to find, beyond a reasonable doubt, that Broadwater did not act in self-defense.

¶47    Under Utah law, a person is "justified in using force intended or likely to cause death or serious bodily injury only if the individual reasonably believes that force is necessary to prevent death or serious bodily injury to the individual or another individual as a result of imminent use of unlawful force." Utah Code § 76-2-402(2)(b). Certainly, some evidence supported Broadwater's position that he reasonably believed that deadly force was necessary to defend himself. Indeed, Broadwater told 911 dispatchers that Roommate had been "threatening" him, and Broadwater took the stand and told the jury the same thing; under these circumstances, the jury was of course free to credit Broadwater's testimony and version of events.

¶48    But ample evidence also supported the State's position. First, while she was inconsistent about exactly where Roommate had been standing, Girlfriend was entirely consistent in her claims that Roommate was stationary, and was not advancing toward Broadwater, when he was shot. Second, the physical evidence, while perhaps not definitive, was at least somewhat supportive of the State's position: the location of the bullet and casing and the damage to the doorframe, as well as the testimony from Examiner that the shot was fired from "an intermediate range of fire," allowed the State to plausibly argue that Broadwater shot

Roommate from a distance. Third, there was no evidence of a fight or a struggle prior to the shooting. And finally, the State argued that even if Broadwater's version of events—that Roommate had charged at him—was correct, Broadwater's use of *deadly* force in response to an unarmed friend's anger was not reasonably justified in any event.

¶49    Because sufficient evidence supported the State's position, the trial court did not err at all, let alone plainly so, by allowing the matter to proceed to the jury for decision. For the same reason, any directed verdict motion Counsel might have made would have been futile, and therefore Counsel did not perform deficiently by declining to make such a motion. On this basis, we reject Broadwater's plain error and ineffective assistance claims related to sufficiency of the evidence.

B.    Closing Argument

¶50    Next, Broadwater takes issue with two matters argued by the prosecutor during the State's closing argument. But because Counsel lodged no objection to these lines of argument, Broadwater now asks us to review these issues for plain error and ineffective assistance. We reject Broadwater's arguments, because he has not carried his burden of demonstrating either plain error or ineffective assistance of counsel.

¶51    First, he asserts that the prosecutor shouldn't have been allowed to argue that it was "not reasonable" for Broadwater to think that he might have suffered death or serious bodily injury from a "one-punch knockout." He takes particular issue with the prosecutor saying, "[T]here's no threat of death or serious bodily injury from a . . . one-punch knockout. You're not going to die being knocked out or being punched." He asserts that this statement is incorrect, and he cites media sources indicating that, on occasion, people do in fact die from a one-punch assault.

¶52 We have already noted that attorneys have "considerable latitude" during closing argument. *See State v. Reid*, 2018 UT App 146, ¶ 49, 427 P.3d 1261 (quotation simplified). In this instance, the prosecutor's argument about one-punch knockouts was not so far outside that latitude as to warrant sua sponte judicial involvement. And reasonable counsel could have decided—as Counsel here apparently did—to forgo an objection and simply respond to the State's point in a responsive argument. Indeed, Counsel responded to the State's theory by arguing that even if the threat of death from a one-punch assault was low, the threat of injury wasn't, and that a homeowner has every right to defend himself against an assault. We are not convinced that such a trial strategy was unreasonable under the circumstances.

¶53 And finally, even if we were to assume—for purposes of the discussion only—that Counsel performed deficiently by electing not to lodge an objection to the State's "one-punch knockout" line of argument, we are unpersuaded that a different outcome to the trial would have been reasonably probable. *See State v. Tuinman*, 2023 UT App 83, ¶ 92, 535 P.3d 362 ("Prejudice exists when there is a reasonable probability that the case would have had a different outcome had trial counsel not performed deficiently." (quotation simplified)), *cert. denied*, 540 P.3d 79 (Utah 2023). Even had such an objection been granted and the "one-punch knockout" argument stricken from the record, the outcome of the trial would quite likely have been the same. That argument—especially after Counsel offered his response—was simply not powerful enough to have meaningfully moved the needle in this case.

¶54 Second, Broadwater takes issue with the prosecutor's argument regarding bullet trajectory. He takes particular issue with the prosecutor's statement that Broadwater's claim regarding Roommate's location at the time of the shooting—that he was well out into the hallway and was shot at close range—

was "just not possible."[2] But Broadwater overlooks the fact that Counsel himself made detailed bullet trajectory arguments during his own closing argument, not only discussing the height at which the bullet had exited Roommate's body and struck the doorframe, but also specifically asserting that it was "not physically possible" for Roommate to have been standing in the doorframe when he was shot. The State was entitled to respond to these arguments in its rebuttal, and in this context the prosecutor's discussion of bullet trajectory, including his statement that Broadwater's position also was "just not possible," was a completely "fair reply" to Counsel's preceding argument. *See State v. Redcap*, 2014 UT App 10, ¶ 38, 318 P.3d 1202 ("The doctrine of fair reply allows a prosecutor to make a counteracting statement after defense counsel opens the door on the issue." (quotation simplified)), *abrogated on other grounds as recognized by State v. Hosman*, 2021 UT App 103, 496 P.3d 1162; *see also Darden v. Wainwright*, 477 U.S. 168, 179 (1986) (stating that "prosecutors' comments must be evaluated in light of the defense argument that preceded it"). Under these specific circumstances, the trial court did not err at all, let alone plainly so, by not sua sponte

---

2. In his list of issues presented for review, Broadwater lists this issue as one that should be reviewed only for plain error and ineffective assistance of counsel, thus appearing to acknowledge that the issue is unpreserved. But in two footnotes set forth later in his brief, Broadwater notes that Counsel did lodge an objection to the argument about Roommate's chest size, and he briefly implies that this issue might be preserved after all. Broadwater has not persuaded us, in these two short footnotes, that a broader objection to the entire line of argument about bullet trajectory was preserved. Moreover, our review of the record leads us to conclude that Counsel's objection was limited merely to evidence about chest size. *See supra* ¶ 21. We therefore address this issue as Broadwater asks us to in his list of issues presented for review: for plain error and ineffective assistance.

intervening to strike the State's argument. And reasonable counsel could readily have believed that the State's bullet trajectory argument was a fair response to the comments Counsel had made just minutes earlier on the same topic, and on that basis forgone an objection.

¶55   Accordingly, Broadwater has not carried his burden of demonstrating either plain error or ineffective assistance of counsel with regard to the challenged portions of the State's closing argument.

CONCLUSION

¶56   With regard to the preserved challenge regarding the limitation the trial court placed on Counsel during closing argument, Broadwater has not demonstrated that any error was harmful to him. And with regard to the unpreserved issues, Broadwater has not demonstrated that the trial court plainly erred or that Counsel rendered ineffective assistance. Accordingly, we reject Broadwater's arguments and affirm his convictions.

———————